**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **EDIBLE ARRANGEMENTS, LLC and EDIBLE ARRANGEMENTS INTERNATIONAL, LLC,** ) ) ) ) | |
| **Plaintiffs,** ) | **Civil Action No. 3:14-cv-00250-VLB** |
| ) | |
| **v.** ) | **February 29, 2016** |
| ) | |
| **PROVIDE COMMERCE, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT PROVIDE COMMERCE, INC.'S MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ........................................................................... 1

II.     STATEMENT OF FACTS ............................................................... 2

        A.      Provide and its Premier Gifting Brands ................................ 2

        B.      EA's Chosen Brand ............................................................ 3

        C.      Keyword Advertising Generally ......................................... 4

        D.      Provide's Use of the Descriptive Terms "Edible" and
                "Arrangements" ................................................................ 6

        E.      The 2010 Communications Between EA and Provide ........... 7

        F.      The 2014 Communications Between EA and Provide ........... 8

        G.      EA's Complaints in This Action ........................................ 9

        H.      The Domain Names at Issue .............................................. 9

        I.      EA's Lack of Evidence of Actual Confusion ..................... 14

III.    ARGUMENT .............................................................................. 14

        A.      Provide's Keyword Advertising Does Not Infringe EA's Mark ........... 15

                1.      Legal Standard—Trademark Infringement ................. 15

                2.      Provide's Fair Use of the Phrase "Edible Fruit
                        Arrangements" Did Not Create a Likelihood of Confusion ..... 16

                        i.      It Was Fair Use to Describe Provide's Products as
                                "Edible Fruit Arrangements" in Advertisements .......... 16

                        ii.     Using "Edible Fruit Arrangements" to Describe
                                Provide's Products Did Not Create a Likelihood of
                                Confusion ...................................................... 20

                                a.      EA's Mark is Descriptive and Weak ..................... 21

                                b.      The Descriptive Terms Used by Provide are
                                        Not Similar to EA's Mark ....................... 23

i

| | | | |
|---|---|---|---|
| | c. | *Provide Does Not Dispute That the Parties' Products are Similar* ............................................... | **25** |
| | d. | *EA Has Not Identified Any Actual Confusion* ...... | **25** |
| | e. | *Provide Acted in Good Faith* ................................ | **28** |
| | f. | *The Parties' Products Are of High Quality* .......... | **29** |
| | g. | *The Parties' Consumers Are Sufficiently Sophisticated* .......................................................... | **30** |
| 3. | | Provide's Bidding on "Edible Arrangements" as a Non-Consumer Facing Keyword Does Not Create a Likelihood of Confusion with EA's Mark ............................................ | **31** |
| B. | | Provide's Keyword Advertising Does Not Dilute EA's Mark ............. | **35** |
| 1. | | EA's Mark is Not Famous ............................................... | **35** |
| 2. | | EA Has Not Established Any Actual or Likely Dilution by Blurring or Tarnishment ................................... | **37** |
| C. | | Provide Is Not Cybersquatting .................................... | **38** |
| IV. | | CONCLUSION ................................................................... | **40** |

# TABLE OF AUTHORITIES

Page(s)

## *Cases*

*Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*,
No. 10-Civ-03738, 2015 WL 5311085 (C.D. Cal. Sept. 10, 2015) .......................... 34

*Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*,
No. 10-Civ-3314, 2015 WL 4033019 (S.D.N.Y. June 29, 2015) ................. 20, 27, 32

*Am. Republic Ins. Co. v. N. Am. Adm'rs, Inc.*,
No. 95-Civ-1004, 1996 WL 291983 (W.D.N.Y. May 21, 1996)................................. 28

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................. 15

*Arrow Fastener Co. v. Stanley Works*,
59 F.3d 384 (2d Cir. 1995) ............................................................................... 21, 29

*Avery Dennison Corp. v. Sumpton*,
189 F.3d 868 (9th Cir. 1999) .................................................................................. 36

*Brockmeyer v. Hearst Corp.*,
248 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................... 26

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*,
70 F.3d 267 (2d Cir. 1995) ..................................................................................... 17

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver*,
511 U.S. 164 (1994)................................................................................................. 39

*Coach Servs., Inc. v. Triumph Learning LLC*,
668 F.3d 1356 (Fed. Cir. 2011) .............................................................................. 36

*CollegeSource, Inc. v. AcademyOne, Inc.*,
No. 10-Civ-3542, 2012 WL 5269213 (E.D. Pa. Oct. 25, 2012) aff'd,
597 F. App'x 116 (3d Cir. 2015)
................................................................................................... 21, 28, 31, 34

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
125 F.3d 28 (2d Cir. 1997) ............................................................................... 17, 18

*David's Bridal, Inc. v. House of Brides, Inc.*,
No. 06-Civ-5660, 2010 WL 323306 (D.N.J. Jan. 20, 2010) .................................... 36

*Deere & Co. v. MTD Prods.*,
    41 F.3d 39 (2d Cir. 1994) ........................................................................ 37

*Dessert Beauty, Inc. v. Fox*,
    568 F. Supp. 2d 416 (S.D.N.Y. 2008) aff'd, 329 F. App'x 333 (2d Cir.
    2009).........................................................................................................*passim*

*In re Eddie Z's Blinds and Drapery, Inc.*,
    74 U.S.P.Q.2d 1037 (T.T.A.B. 2005) ....................................................... 22

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*,
    228 F.3d 56 (2d Cir. 2000) ............................................................... 17, 19

*Essence Commc'ns, Inc. v. Singh Indus., Inc.*,
    703 F. Supp. 261 (S.D.N.Y. 1988)........................................................... 26

*First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*,
    101 F.3d 645 (10th Cir. 1996)................................................................*passim*

*Giggle, Inc. v. netFocal, Inc.*,
    856 F. Supp. 2d 625 (S.D.N.Y. 2012) ..................................................... 23

*GMA Accessories, Inc. v. Croscill, Inc.*,
    No. 06-Civ-6236, 2008 WL 591803 (S.D.N.Y. March 3, 2008) ............... 36

*Gruner v. Jahr USA Pub. v. Meredith Corp.*,
    991 F.2d 1072 (2d Cir. 1993)………………………………………………...……15, 21, 23

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*,
    No. 12-Civ-8205, 2013 WL 3943267 (S.D.N.Y. July 31, 2013) .............. 36

*Heller Inc. v. Design Within Reach, Inc.*,
    No. 09-Civ-1909, 2009 WL 2486054 (S.D.N.Y. Aug.15, 2009)............... 35

*Infostream Group Inc. v. Avid Life Media Inc.*,
    No. 12-Civ-09315, 2013 WL 6018030 (C.D. Cal. Nov. 12, 2013) ........... 34

*J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*,
    No. 06-Civ-0597, 2007 WL 30115 (E.D. Pa., Jan. 4, 2007) .................... 34

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009) .................................................................... 18

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    340 F. Supp. 2d 415 (S.D.N.Y. 2004) *aff'd in part,* 454 F.3d 108
    (2d Cir. 2006) ........................................................................................... 38

*Medici Classics Prods., LLC v. Medici Grp., LLC*,
    683 F. Supp. 2d 304 (S.D.N.Y. 2010) ................................................................ 30

*Moseley v. V Secret Catalogue, Inc.*,
    537 U.S. 418 (2003) ............................................................................................. 35

*Mushroom Makers, Inc. v. R. G. Barry Corp.*,
    580 F.2d 44 (2d Cir. 1978) ................................................................................. 20

*Nautilus Grp., Inc. v. ICON Health and Fitness, Inc.*,
    372 F.3d 1330 (Fed. Cir. 2004) ......................................................................... 27

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) ........................................................ 29, 30, 33, 34

*Olde Tyme Foods Inc. v. Roundy's Inc.*,
    961 F.2d 200 (Fed. Cir. 1992) ........................................................................... 15

*Penta Hotels Ltd. v. Penta Tours*,
    No. 86-Civ-089, 1988 WL 384940 (D. Conn. Sept. 30, 1988) .................. 25, 26, 28

*Plus Prods. v. Plus Disc. Foods, Inc.*,
    722 F.2d 999 (2d Cir. 1983) ............................................................................... 30

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961) ........................................................................*passim*

*Publ'g Corp. v. Manhattan Magazine, Inc.*,
    616 F.Supp. 370 (S.D.N.Y.1985), *aff'd without op.*, 788 F.2d 3 (2d
    Cir.1986) .............................................................................................................. 27

*Res. Lenders, Inc. v. Source Solutions, Inc.*,
    404 F. Supp. 2d 1232 (C.D. Cal. 2005) .............................................................. 36

*In re Rosemount Inc.*,
    86 U.S.P.Q.2d 1436 (T.T.A.B. 2008) ................................................................. 22

*In re S.D. Fabrics, Inc.*,
    223 U.S.P.Q. 54 (T.T.A.B. 1984) ....................................................................... 24

*Savin Corp. v. Savin Grp.*,
    391 F.3d 439 (2d Cir. 2004) ........................................................... 15, 25, 35, 37

*Star Indus., Inc. v. Bacardi & Co.*,
    412 F.3d 373 (2d Cir. 2005) ............................................................................... 29

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
    736 F.3d 198 (2d Cir. 2013) ............................................................................... 36

*Streetwise Maps, Inc. v. VanDam, Inc.*,
    159 F.3d 739 (2d Cir. 1998) ............................................................ 20, 21

*Sunenblick v. Harrell*,
    895 F. Supp. 616 (S.D.N.Y. 1995) aff'd, 101 F.3d 684 (2d Cir. 1996) .................. 23

*Sure-Fit Prods. Co. v. Saltzson Drapery Co.*,
    254 F.2d 158 (C.C.P.A. 1958) ............................................................ 24

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F.3d 93 (2d Cir. 2010) ............................................................ 35

*Timex Corp. v. AAI.FosterGrant, Inc.*,
    No. 300-Civ-295, 2000 WL 1576396 (D. Conn. Sept. 14, 2000) aff'd,
    8 F. App'x 94 (2d Cir. 2001) ............................................................ 25

*Universal City Studios, Inc. v. Nintendo Co.*,
    746 F.2d 112 (2d Cir. 1984) ............................................................ 24

*Verilux, Inc. v. Hahn*,
    No. 05-Civ-254, 2007 WL 2318819 (D. Conn. Aug. 10, 2007) .............................. 16

*Virgin Enters. Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003) ............................................................ 15

*Wonder Labs, Inc. v. Procter & Gamble Co.*,
    728 F. Supp. 1058 (S.D.N.Y. 1990)...................................................... 28

## *Statutes*

15 U.S.C. § 1114.......................................................................... 15, 16

15 U.S.C. § 1125..................................................................... *passim*

## *Other Authorities*

Fed. R. Civ. P. 56 ........................................................................ 14

J.T. McCarthy, *The 1996 Federal Anti-Dilution Statute*,
    16 Cardozo Arts & Ent. L.J. 587, 592 (1998)........................................... 35

Defendant Provide Commerce, Inc. ("Provide") moves for summary judgment on all six counts of the First Amended Complaint filed by Plaintiffs Edible Arrangements, LLC and Edible Arrangements International, LLC ("EA").

I.    **INTRODUCTION**

EA did not file this lawsuit to protect any legitimate trademark rights or to protect the public from consumer confusion. Instead, EA filed this lawsuit to unfairly prevent competition by attempting to gain an improper monopoly over descriptive terms necessary for competitors to identify their products, and to impose significant litigation burdens on those who seek to compete in the marketplace.

*First*, EA asserts that Provide's prior use of the phrase "edible fruit arrangements" in the text of Provide's keyword advertisements infringed EA's rights in its "edible arrangements" trademark.[1] But it is undisputed that Provide sells fruit products ("fruit") that are intended for human consumption ("edible") and are organized in a particular manner ("arrangements"). Thus, the undisputed factual record establishes that Provide's use of the phrase "edible fruit arrangements" to describe its edible fruit arrangements was fair use and was not likely to cause confusion with EA's "edible arrangements" mark.

*Second*, EA asserts that Provide infringes EA's trademark rights by bidding on the term "edible arrangements" as a keyword in connection with Provide's Internet advertising. But not one court in the entire country has ever held a

---

[1] At one time, Provide used the phrase "edible fruit arrangements" to describe its products in the text of its keyword advertisements (*e.g.*, "save more than 50% on edible fruit arrangements"); however, Provide no longer uses this phrase. *See* Statement of Undisputed Facts ("SF") ¶ 25.

1

defendant liable for trademark infringement by finding a likelihood of confusion based solely on the defendant's keyword bidding. This case should be no different. Indeed, the undisputed factual record demonstrates that Provide's bidding on the keyword term "edible arrangements" does not create a likelihood of confusion with EA's mark.

*Third*, EA asserts that Provide violated the Anticybersquatting Consumer Protection Act ("ACPA") because Provide "registered, trafficked in, and used" three domain names that consist of misspelled variations of EA's "edible arrangements" trademark. Provide has demonstrated *repeatedly* since EA filed its First Amended Complaint (and EA has failed to demonstrate otherwise through discovery) that Provide did not register, traffic in, or use the domain names at issue, and the record establishes that Provide did not violate the ACPA.

The undisputed factual record demonstrates that EA cannot prevail on any of its claims. As a result, the time has come for the Court to dispose of those claims, and grant Provide's Motion for Summary Judgment.

## II.   STATEMENT OF FACTS

### A.   Provide and its Premier Gifting Brands

Provide is a premier gifting company, offering a variety of unique products including flowers, chocolates, fresh fruit, gift baskets, and unique personalized gifts under brands such as ProFlowers, ProPlants, RedEnvelope, Personal Creations, Shari's Berries, and Cherry Moon Farms. SF ¶ 1. Most relevant to this case is Shari's Berries, which offers a variety of edible treats that are packaged in a decorative manner through its online boutique at *<berries.com>*, including gourmet hand-dipped strawberries, cherries, and apples; hand-decorated cake

pops; handmade s'mores; and pretzels hand-dipped in caramel and coated with decadent toppings. *Id*. ¶ 2. Shari's Berries is a leader in the fresh fruit gift industry; indeed, it has sent over <u>*35 million*</u> berries since 2013. *Id*. ¶ 3.

B.    <u>EA's Chosen Brand</u>

At the start of EA's business, its founder selected the brand "Edible Arrangements" to give customers and prospective customers an immediate understanding of the products that EA offers—namely, products intended for human consumption ("edible") and organized in a particular manner ("arrangements"). SF ¶ 6. Indeed, a *Wall Street Journal* article describes the nature of the naming process EA employed:

> In a day, Tariq Farid [EA's founder] came up with a short list of names that he discussed with his employees. None seemed quite right. Then <u>*he asked the group to help him describe his product*</u>. But it was <u>*his own description that proved a hit*</u>.

*Id*. ¶ 7. EA's choice to adopt a brand with such a descriptive connotation is not without consequence. A basic tenet of trademark law is that one who adopts a descriptive trademark that uses common terms in the English language sacrifices the ability to enforce the trademark against others, because others must have the ability to use those terms to describe their products.

In fact, when EA first applied to register the phrase "edible arrangements" as a trademark with the United States Patent and Trademark Office ("USPTO") for use in connection with "fresh fruits cut in to flower shapes and arranged in containers as floral designs," the USPTO refused registration of the phrase based on its descriptiveness. *Id*. ¶ 8. EA responded by amending its application to the secondary "supplemental" federal trademark register, thereby conceding that the

3

phrase "edible arrangements" is descriptive. *Id*. ¶ 9. Since that time, whenever EA filed applications to register marks consisting of or containing the phrase "edible arrangements," the USPTO continued to require that EA admit those words are descriptive by disclaiming its exclusive rights to use those words, and by registering the phrase on the Supplemental Register, etc. *Id*. ¶ 10.

Instead of accepting the consequences of the sacrifice it made in selecting such a descriptive phrase to represent its brand, EA has tried to unfairly prevent others, including Provide, from lawfully using the terms "edible" and "arrangements" to describe their own products which are intended for human consumption and organized in a particular manner.[2] *Id*. ¶ 11. EA sent dozens of cease and desist letters to other companies—from large businesses, such as Wal-Mart and Harry and David, to small businesses such as the Arlington Florist & Garden Center in North Arlington, New Jersey and Destiny's Precious Gifts in Salinas, California—alleging infringement of EA's trademarks.[3] *Id*. ¶ 12.

### C.   Keyword Advertising Generally

"Keyword advertising" is a common method of advertising used by companies to market their products through programs offered by Internet search

---

[2] In addition, EA seems to be embarking on a pattern of anti-competitive behavior; over the last few years, it has attempted to register descriptive phrases and terms such as "dipped fruit," "dip," "edible cakes," "edibles," and "fruit arrangements," which it presumably intends to enforce against others—just as it is attempting to do in this case against Provide. *See* U.S. Trademark Ser. Nos. 86/261,856; 86/252,812; 86/029,530; 85/951,775; and 86/161,883. SF ¶ 14.

[3] EA has even filed lawsuits against such companies. For example, EA filed a trademark infringement suit against 1-800-Flowers.com, claiming that 1-800-Flowers.com, among other things, has infringed its "bouquet" family of marks and infringed its "edible arrangements" marks through keyword advertising. *Edible Arrangements International, LLC et al v. 1-800-Flowers.com, Inc. et al*, No. 14-Civ-01744 (D. Conn. *filed* Nov. 11, 2014).

engines such as Google, Bing, and Yahoo. SF ¶ 16. The premise behind keyword advertising is that companies wish to have their advertisements appear when consumers use search engines to search for terms related to the companies' businesses. *Id.* ¶ 17. To ensure that their advertisements appear when consumers search for related or competitive products and services, companies pay fees to the search engines by "bidding" on particular terms. *Id.* ¶ 19. Because the bidding happens behind the scenes, consumers searching via Google, Bing, and Yahoo have no way of knowing which particular terms that companies have bid on; thus, keyword bidding is often referred to as "non-consumer-facing."[4] *Id.* ¶ 20

By way of example, when consumers enter "Pizza Hut pizza" into a search engine, competitors such as Papa John's, Domino's, and Little Caesars wish to have their advertisements appear on the results page so that the consumers may have easy access to their websites and purchase their pizza. Such companies then bid on keyword terms such as "pizza," "Pizza Hut," "Domino's," "Papa John's," and "Little Caesars." The following image depicts a scenario where a consumer entered "Pizza Hut" into the Bing search engine, and multiple keyword advertisements (from Papa John's, and even Pizza Hut itself, both boxed in red) appeared separate from the "organic" search results (boxed in yellow):

---

[4] In contrast, the "ad text" that appears on the search engine results page itself *is* consumer-facing. SF ¶ 21.



*Id.* ¶ 18.

**D.    Provide's Use of the Descriptive Terms "Edible" and "Arrangements"**

For many years, just like thousands of other companies across the country, Provide has used keyword advertising to market its products. SF ¶ 22. Because Provide wishes to have its ads displayed on search engine results pages whenever consumers enter search terms that are relevant to Provide's products, Provide bids on thousands of terms that describe its products, such as "fruit," "dipped berries," "edible fruit," "flowers for moms," "Valentine's birthday cake," "fruit bouquets," and "edible arrangements." *Id.* ¶ 23. Again, these terms are non-consumer-facing. *Id.* The advertisements that are displayed on the search engine results pages whenever consumers search for these terms are consumer-

facing and contain a variety of phrases, such as "Save 20% on Famous Shari's Berries" and "Up to 70% off Edible Fruit Bouquets." *Id*. ¶ 24. At one time, Provide used the phrase "edible fruit arrangements" to describe its products in the text of its keyword advertisements (*e.g.*, "save more than 50% on edible fruit arrangements"); however, Provide no longer uses this phrase. *Id*. ¶ 25. When Provide used the phrase "edible fruit arrangements" in the text of its keyword advertisements, Provide used the phrase in "plain text," and not as a trademark. *Id*. ¶ 26. Additionally, when Provide used the phrase "edible fruit arrangements" in the text of its keyword advertisements, Provide used the phrase in close proximity to its own brands, such as ProFlowers or Shari's Berries. *Id*. ¶ 27.

E.    The 2010 Communications Between EA and Provide

EA first attempted to prevent Provide from using the descriptive words "edible" and "arrangements" in connection with advertising its fresh fruit products in 2010. SF ¶ 28. EA sent a letter to Provide on February 9, 2010, objecting to Provide's use of the phrase "edible arrangements" in "advertising several competing goods and services." *Id*. ¶ 29. The letter did not identify any specific "advertising"; it merely enclosed (i) an excerpt from the Shari's Berries website; and (ii) a printout displaying the results of a Google search for the phrase "edible arrangements," and showing that Provide used the phrases "edible arrangements" and "edible fruit arrangements" in the text of its advertisements (displayed through the Google AdWords program) to describe its fresh fruit arrangements and gifts available for sale. *Id*. ¶ 30.

On February 16, 2010, Provide responded and asked EA to identify the specific advertisements that were the subject of EA's objections. *Id*. ¶ 31. Over a

7

month later, on March 17, 2010, EA responded and did not object to Provide's use of the phrase "edible arrangements" as a non-consumer-facing keyword. *Id*. ¶ 32. The only objection EA raised related to Provide's use of the phrase "edible arrangements" was in the text of its advertisements displayed through the Google AdWords program. *Id*. ¶ 33. Even though the enclosures provided with <u>*both*</u> of EA's letters contained screenshots showing advertisements where Provide also used the phrase "edible fruit arrangements" to describe its fresh fruit products, EA never objected to those uses in either letter. *Id*. ¶ 34.

On March 25, 2010, Provide responded and explained the steps it had taken to ensure that "edible arrangements" would no longer appear in the text of its advertisements displayed through the Google AdWords program. *Id*. ¶ 35. Provide concluded the letter with a statement that Provide believes the matter should now be resolved, and invited EA to contact Provide if it had any further questions or concerns. *Id*. ¶ 36. EA never replied. *Id*. ¶ 37.

F.     The 2014 Communications Between EA and Provide

Despite the fact that (i) EA knew about Provide's use of "edible fruit arrangements" in its online advertisements since at least as early as February 9, 2010, and (ii) Provide's use of the phrase "edible arrangements" as a non-consumer-facing keyword and the use of the phrase "edible fruit arrangements" in the text of its keyword advertisements remained the same after the parties' 2010 correspondence, EA waited <u>*four years*</u> to send Provide another letter. SF ¶ 38. On February 6, 2014, EA sent another letter to Provide, wherein EA objected to Provide's: (i) purchase of the phrase "edible arrangements" as a non-consumer-facing keyword through the Google AdWords and Bing Ads programs;

**8**

and (ii) use of the phrase "edible fruit arrangements" in the text of its advertisements displayed through the Google AdWords and Bing Ads programs. *Id*. ¶ 39.

On February 13, 2014, Provide responded and—as it had already done in 2010—explained that: (i) its purchase of the phrase "edible arrangements" for use as a non-consumer-facing keyword was lawful; and (ii) its use of the phrase "edible fruit arrangements" in the text of its advertisements was fair use. *Id*. ¶ 40.

### G.   EA's Complaints in This Action

EA never responded to Provide's February 13, 2014 letter; instead, two weeks later it filed a Complaint against Provide. SF ¶¶ 41, 42. EA's Complaint asserted rights in the trademark "edible arrangements" ("EA's mark") and alleged infringement claims based on Provide's: (i) use of "edible fruit arrangements" in the text of its keyword advertisements; and (ii) bidding on the phrase "edible arrangements" as a non-consumer-facing keyword. *Id*. ¶ 43. Recognizing the weakness of its claims—particularly considering that Provide makes descriptive and fair use of common words to describe its own edible fruit arrangements, ***and*** that EA waited four years to bring the claims—EA hastily decided to attempt to buttress its allegations by filing an amended complaint, alleging infringement under the Anticybersquatting Consumer Protection Act ("ACPA"). *Id*. ¶ 44. EA's First First Amended Complaint falsely alleges that Provide registered the domain names <*edibelarrangements.com*> and <*ediblearragements.com*>, and claims that those domain names infringe EA's mark. *Id*. ¶ 45.

### H.   The Domain Names at Issue

Provide did not register, and does not own or control the domain names

*<edibelarrangements.com>* and *<ediblearragements.com>*. SF ¶ 46. In fact, Provide was completely unaware of the domain names until EA filed its First Amended Complaint alleging an ACPA claim. *Id*. ¶ 47. After reviewing EA's allegations, it became clear that EA's only reasons for assuming that Provide registered the domain names were because the domain names occasionally redirected to Provide's *<berries.com>* website and because a domain name "privacy service," Fundacion Private Whois ("Fundacion"), shielded the registrant's contact information in the domain name records.[5] *Id*. ¶ 48.

Evidently, EA did not conduct any factual investigation to confirm its assumptions before filing the First Amended Complaint; if it had, it would have been able to determine the true identities of the registrant(s). To clear up EA's mistake, Provide's counsel contacted EA's counsel and explained that Provide did not register, own, or control the domain names and that EA had sued the wrong party. *Id*. ¶ 49. Despite this, EA did not withdraw its Amended Complaint.

After EA was made aware that it had sued the wrong party—indeed even before it filed the First Amended Complaint—EA could have taken any number of actions to determine the true registrant's identity, including:

   (i) Sending a letter to Internet.bs Corp., the listed registrar of the domain names, identifying the alleged infringement and requesting that Internet.bs Corp. reveal the registrant's contact information;

   (ii) Sending a similar letter to Fundacion, the privacy service protecting the

---

[5] EA's First Amended Complaint also alleges that, "[u]pon information and belief, Provide has registered other domain names confusingly similar to the Edible Arrangements Marks that will be revealed after a reasonable opportunity for further investigation and discovery." SF ¶ 70. Because Provide does not own *any* domain names that are similar to EA's *<ediblearrangements.com>* domain name, it denied EA's allegations in its Answer. *Id*. ¶ 71. Discovery has now closed, and EA has not identified any other domain names. *Id*. ¶ 72.

registrant's identity, identifying the alleged infringement and requesting that Fundacion reveal the registrant's contact information; and/or

(iii) Filing a short UDRP complaint naming Fundacion as the respondent.

*Id*. ¶ 50. All of these actions are relatively inexpensive, straightforward, and frequently used by parties alleging ACPA claims to determine the true identities of domain name registrants. EA took none of these actions, and instead relied on its bare assumptions in asserting and maintaining its ACPA claim.

In fact, just two weeks after Provide's counsel informed EA's counsel that Provide does not own or control the domain names, EA's counsel sent Provide's counsel a threatening letter, restating its ACPA claim and threatening injunctive action. *Id*. ¶ 51. That same day, Provide's counsel replied to the letter, reiterating that Provide does not own or control the domain names. *Id*. ¶ 52. Then within a week, Provide filed its Answer to EA's First Amended Complaint, formally denying ownership and control of the domain names. *Id*. ¶ 53. Shortly thereafter, the parties held their Rule 26(f) conference, where Provide's counsel *again* reiterated that Provide does not own or control the domain names. *Id*. ¶ 54. Despite all of this information, EA never withdrew its First Amended Complaint and continued to press on with its meritless ACPA claim.

At the same time, Provide was proactively taking the actions that EA should have already taken itself to determine the true registrant. *Id*. ¶ 55. Provide sent letters to the registrar (Internet.bs Corp.) and domain name privacy service (Fundacion), as well as to digital advertising companies that Provide suspected may have been involved in the redirection of the domain names. *Id*. ¶ 56. Unfortunately, neither of the entities responded to Provide's letters (probably

because Provide was merely a third-party victim of a false infringement claim, not the party actually alleging the infringement). *Id.* ¶ 57.

EA's refusal to withdraw its claim is in bad faith, particularly considering that: (i) there exists no evidence that Provide registered any of the domain names at issue; (ii) EA did not conduct any factual inquiry to determine the identity of the true registrant; (iii) Provide had informed EA repeatedly that EA had sued the wrong party; and (iv) Provide had answered EA's First Amended Complaint, formally denying ownership and control of the domain names. *Id.* ¶¶ 46-57.

In fact, while Provide was sending letters and conducting its own investigation in an attempt to identify the true owner of the domain names, EA was spending its time preparing and filing a frivolous Motion for Preliminary Injunction based on its ill-conceived ACPA claim, which for the first time introduced Provide to a third domain name <*ediblearangements.com*>.[6] *Id.* ¶ 58. As with the other two domain names, Provide does not own or control this domain name either, and was not even aware of the domain name until it received EA's Motion for Preliminary Injunction. *Id.* ¶ 59.

Provide has made repeated efforts to determine the identities of the domain name registrants. *Id.* ¶ 60. Provide sent follow-up letters to the registrar (Internet.bs Corp.) and privacy service (Fundacion) associated with the <*edibelarrangements.com*> and <*edibelarragements.com*> domain names, as well as to the digital advertising companies (adMarketplace and 7search) that Provide suspected might be responsible for the redirection of the domain names. *Id.*

---

[6] **EA withdrew its Motion after Provide filed its Opposition brief. SF ¶ 58, n. 1.**

Additionally, Provide sent letters to the registrar (Fabulous.com) and privacy service (Whois Privacy Services Pty) associated with the <*ediblearrangements.com*> domain name (which, again, Provide had learned about for the first time when it received EA's Motion for Preliminary Injunction). *Id*. ¶ 62. Fabulous.com replied to Provide and refused to reveal the registrant or otherwise take any action because Provide was merely a third party. *Id*. ¶ 63. Notably, Fabulous.com admitted that it would be required to take action if ordered by a UDRP or court of competent jurisdiction—an order which EA could have easily obtained had it filed the proper action against the proper party. *Id*. ¶ 64. To date, Provide has not received any other responses to its letters, presumably for the same reasons Fabulous.com refused to assist Provide. *Id*. ¶ 65.

Provide moved for judgment on the pleadings on EA's ACPA claim over a year-and-a-half ago, on the basis that EA failed to join certain indispensable parties—the actual domain name registrants and privacy services that shielded the registrants' identities. *Id*. ¶ 66. The Court denied the motion, and concluded that "discovery [would] uncover the nature of [Provide's] relationship to both the privacy services and the true registrant(s) of the typosquatting domains." *Id*. ¶ 67.

Throughout discovery, Provide conducted additional internal inquires to continue to confirm that it did not register or own the domain names at issue. *Id*. ¶ 68. Not surprisingly, EA did not identify *any* evidence to the contrary during discovery, and no such evidence exists. *Id*. Indeed, the factual record has

remained largely unchanged since EA filed the original Complaint.[7]

I.      **EA's Lack of Evidence of Actual Confusion**

In an attempt to establish evidence of actual confusion between EA and Provide, EA produced records of six phone calls between consumers and EA's customer service department. SF ¶ 73. The records reflect that the consumers called EA regarding the statuses of certain orders that the consumers either were placing or had placed; over the course of those calls, the EA representatives suspected (but were unable to confirm in every case) that the consumers were attempting to place or may have actually placed their orders with other companies, and not with EA. *Id*. The records do *not*, however, reflect: (i) the years that the orders and/or calls were placed; (ii) whether the orders originated with the consumers clicking on one of Provide's keyword advertisements; and (iii) that at the time of the purchases, the consumers actually made the purchases under the belief that they were purchasing the products through EA, but were actually purchasing the products through a different company. *Id*. ¶ 74. Moreover, Provide is not aware of any instances of actual confusion. *Id*. ¶ 75.

III.    **ARGUMENT**

Summary judgment is appropriate where there is "no genuine issue as to any material fact." Fed. R. Civ. P. 56. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

---

[7] It is notable that even if EA were to somehow prevail on its ACPA claim, Provide does not even have the ability to give EA the relief it seeks (transfer of the domain names to EA). Because Provide does not own or control the domains at issue, it has no means by which to transfer the domain names to EA. *Id*. ¶ 69.

14

genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Savin Corp. v. Savin Grp.*, 391 F.3d 439, 462 (2d Cir. 2004) (affirming District Court's grant of summary judgment in favor of the defendant after finding no likelihood of confusion). A dispute as to a material fact is genuine only if a reasonable fact finder viewing the entire record could resolve the dispute in favor of the nonmoving party. *Olde Tyme Foods Inc. v. Roundy's Inc.*, 961 F.2d 200, 202 (Fed. Cir. 1992)). In this case, there is no genuine dispute as to any material fact, and no reasonable jury could find for EA on _any_ of EA's claims. Thus, Provide is entitled to summary judgment as a matter of law.

### A.  Provide's Keyword Advertising Does Not Infringe EA's Mark

Summary judgment is appropriate because EA cannot show that Provide's use of the descriptive phrase "edible fruit arrangements" in consumer-facing advertisements infringed EA's mark, or that Provide's bidding on the term "edible arrangements" as a non-consumer-facing keyword infringes EA's mark.

#### 1.  *Legal Standard—Trademark Infringement*

To succeed on a trademark infringement claim, a plaintiff must prove that: (i) "its mark is entitled to protection;" and (ii) "even more important, that the defendant's use of its own mark will likely cause confusion with the plaintiff's mark." *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993). This test applies to EA's claims for: (i) federal trademark infringement under 15 U.S.C. § 1114; (ii) federal false designation of origin and unfair competition under 15 U.S.C. § 1125(a); (iii) common law trademark infringement; and (iv) state unfair competition and deceptive trade practices under Conn. Gen. Stat. 42-110b(a). *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003)

(applying the two-prong test to claims under 15 U.S.C. §§ 1114, 1125(a)); *Verilux, Inc. v. Hahn*, No. 05-Civ-254, 2007 WL 2318819, at *10 (D. Conn. Aug. 10, 2007) (noting that the test for common law trademark infringement and unfair competition under Connecticut law is identical to that under the Lanham Act).

Here, a reasonable jury would find that Provide's use of the descriptive phrase "edible fruit arrangements" in its consumer-facing keyword advertising did not infringe EA's mark, and that Provide's bidding on "edible arrangements" in its non-consumer-facing keyword advertising did not infringe EA's mark.

### 2. *Provide's Fair Use of the Phrase "Edible Fruit Arrangements" Did Not Create a Likelihood of Confusion*

Provide's use of the descriptive phrase "edible fruit arrangements" was a fair use and did not create any likelihood of confusion with EA's mark.

#### i. *It Was Fair Use to Describe Provide's Products as "Edible Fruit Arrangements" in Advertisements*

Provide sells a wide variety of fruit products that are intended for human consumption and are packaged and arranged in a decorative manner. SF ¶¶ 1, 2. Not surprisingly, when Provide markets these fruit products to consumers through online advertising (including advertisements that appear in response to the use of keywords by consumers), it uses advertising language that explains to the consumer what the products are. *Id*. ¶¶ 22-24. For example, Provide uses descriptive terms and phrases such as "fruit," "dipped berries," and "fruit bouquets." *Id*. ¶ 23. At one time, Provide also used the phrase "edible fruit arrangements" to describe its products in the context of keyword advertisements (*e.g.*, "save more than 50% on edible fruit arrangements"); however, Provide no longer uses this phrase. *Id*. ¶ 25.

16

It is well-settled that a company's use of such descriptive words and phrases to describe the company's products is "fair use" and permissible. *See Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (affirming the District Court's holding that the defendant's use of the phrase "sealed with a kiss" to "describe an action that the sellers hope consumers will take, using their product" was a permissible fair use and did not constitute infringement). This fundamental principle stands even where a plaintiff owns a federal registration for a trademark that is arguably similar to the phrase that the defendant uses to describe its goods. *See Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995) ("It is a fundamental principle marking an outer boundary of the trademark monopoly that, although trademark rights may be acquired in a word or image with descriptive qualities, the acquisition of such rights will not prevent others from using the word or image in good faith in its descriptive sense, and not as a trademark.").

A court uses a three-part test to determine whether a particular use is a descriptive fair use. *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000). In particular, the court examines whether the use is: (i) other than as a mark; (ii) in a descriptive sense; and (iii) in good faith. *Id*. In this case, there is no genuine issue of material fact that could support a reasonable jury finding that Provide is engaged in anything other than descriptive fair use of the phrase "edible fruit arrangements."

<u>*First*</u>, Provide did not use the phrase "edible fruit arrangements" as a trademark. "A trademark use occurs when a mark indicates the source or origin

17

of consumer products." *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 424 (S.D.N.Y. 2008) aff'd, 329 F. App'x 333 (2d Cir. 2009). The Second Circuit has equated "use as a mark with the use of a term as a <u>*symbol*</u> to attract public attention." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 400 (2d Cir. 2009) (internal quotations omitted, emphasis added). Here, Provide used "edible fruit arrangements" in plain text, and <u>*not*</u> as a symbol to attract public attention or to indicate source or origin. SF ¶ 26. Additionally, Provide used the phrase in close proximity to its own brands, such as ProFlowers or Shari's Berries. SF ¶ 27. *See Cosmetically Sealed Indus.*, 125 F.3d at 31 (stating that use of a descriptive phrase in conjunction with the defendant's marks supports a finding of non-trademark use).

<u>*Second*</u>, Provide used "edible fruit arrangements" in a descriptive sense. "A use of a mark is descriptive if the words were used to describe the ingredients, quality[,] or composition of a product, not the source of the product." *Dessert Beauty*, 568 F. Supp. at 425. Here, it is indisputable that Provide used the phrase "edible fruit arrangements" to describe the composition of its products, which are fruit products ("fruit") that are organized in a certain manner ("arrangements") and intended for consumption ("edible"). SF ¶¶ 25-27.

Moreover, courts have also found that where many businesses are alleged to have used terms similar to a plaintiff's mark, it demonstrates the inherently descriptive nature of the mark. *See, e.g.*, *Dessert Beauty*, 568 F. Supp. 2d at 426 (finding that the fact that many businesses used the same term—"love potion"—to describe their products demonstrated that there was no other reasonably

18

available term to describe the meaning captured by the term). It is undisputed that EA has sent cease-and-desist letters to dozens of other companies (and has even filed suits against some of them), alleging infringement of EA's mark—which evidences the descriptive nature of EA's mark and demonstrates that Provide's use of "edible fruit arrangements" was descriptive fair use. SF ¶¶ 11-12.

*Third*, Provide used the phrase "edible fruit arrangements" in good faith. The Second Circuit equates bad faith with the defendant's "intent to trade on the good will of the trademark holder by creating confusion as to source or sponsorship." *EMI Catalogue P'ship*, 228 F.3d at 66. Here, the record is devoid of any fact that would show that Provide created confusion as to source or sponsorship; indeed, the record demonstrates that Provide has only ever acted in good faith. SF ¶¶ 5, 22-27. In particular, ever since EA first approached Provide in 2010, Provide has maintained that it has acted lawfully because it used the phrase "edible fruit arrangements" only in a descriptive sense, and not as a trademark. *Id*. ¶¶ 28-40. *See Dessert Beauty*, 568 F. Supp. 2d at 427 (finding that the defendant's consistent assertion of descriptive fair use in response to the plaintiff's repeated cease-and-desist letters was strong evidence of good faith). Notably, when assessing good faith intent as part of a fair use analysis, courts also examine the same "likelihood of confusion" factors that are assessed as part of a trademark infringement analysis. *See EMI Catalogue P'ship*, 228 F.3d at 66. These factors are analyzed below, and clearly establish that Provide has acted in good faith.

For the foregoing reasons, the undisputed factual record demonstrates that Provide's use of the phrase "edible fruit arrangements" in its keyword advertisements was a descriptive fair use and thus could not infringe EA's mark.

> ii.  *Using "Edible Fruit Arrangements" to Describe Provide's Products Did Not Create a Likelihood of Confusion*

Even if Provide's use of the phrase "edible fruit arrangements" was not a fair use, it still did not infringe EA's trademark rights. ". . . [T]he crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978). Federal courts determine whether a mark is likely to cause confusion based on an assessment of the "*Polaroid*" factors. These factors include: (i) the strength of the plaintiff's mark; (ii) the degree of similarity between the competing marks; (iii) the proximity of the products, and the likelihood that the prior owner will "bridge the gap"; (iv) actual confusion; (v) the defendant's good faith; (vi) the quality of the defendant's products; and (vii) the sophistication of the consumers. *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, No. 10-Civ-3314, 2015 WL 4033019, at *7 (S.D.N.Y. June 29, 2015) (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).

Summary judgment of non-infringement in a trademark case is proper when the balance of factors weighs in the defendant's favor such that no reasonable jury could find a likelihood of confusion—a court need not find that *all* factors weigh in the defendant's favor. *See Streetwise Maps, Inc. v. VanDam, Inc.*,

159 F.3d 739, 746 (2d Cir. 1998) (reversing finding of likelihood of confusion because the balance of factors weighed in the defendant's favor even though the mark was entitled to some protection and the parties' products were in direct competition); *see also CollegeSource, Inc. v. AcademyOne, Inc.*, No. 10-Civ-3542, 2012 WL 5269213, at *20 (E.D. Pa. Oct. 25, 2012) aff'd, 597 F. App'x 116 (3d Cir. 2015) (granting summary judgment of no likelihood of confusion even though some of the factors favored the plaintiff).

An analysis of the *Polaroid* factors demonstrates that there was no likelihood of confusion between EA's mark and Provide's use of the phrase "edible fruit arrangements" in the text of Provide's keyword advertising.

### a.      EA's Mark is Descriptive and Weak

The first *Polaroid* factor requires a court to analyze the strength and protectability of the asserted trademark. *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995). This analysis requires an assessment of both the "inherent strength" and the "commercial strength" of the asserted trademark. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998) ("To gauge a mark's strength, we consider two factors: its inherent distinctiveness, and its distinctiveness in the marketplace."). EA's mark is: (i) inherently weak because it is inherently descriptive; and (ii) commercially weak as shown by the widespread use by other businesses.

The inherent strength of a trademark and the degree of protection to which it is entitled are categorized by the degree of the mark's distinctiveness in the following ascending order: generic, descriptive, suggestive, and arbitrary or fanciful." *Gruner + Jahr*, 991 F.2d at 1075. Descriptive trademarks "tell[]

something about" the products' "qualities, ingredients or characteristics," and have a very limited "scope of protection" (i.e., it is difficult to enforce descriptive trademarks against arguably similar uses). *Id.* at 1076.

Here, there is no dispute that EA's mark is inherently descriptive. EA's fruit products are "edible" (because they are intended for human consumption), and they are "arrangements" (because they are organized and assembled in a particular manner). SF ¶¶ 6-10. Thus, EA's mark "tells something" about the fruit products' qualities and characteristics. Indeed, even EA's CEO acknowledged that he chose the mark *because* of the mark's descriptive nature. *Id.* ¶¶ 6-7. Additionally, when EA first applied to federally register "edible arrangements" as a trademark, the USPTO refused registration on the basis of descriptiveness. *Id.* ¶ 8. EA then amended its application to the secondary "supplemental" federal trademark register, thereby conceding the descriptiveness of the phrase.[8] *Id.* ¶ 9. Since then, whenever EA has filed applications to register marks consisting of or containing the phrase "edible arrangements," the USPTO has continued to require that EA admit those words are descriptive (by disclaiming its exclusive rights to use those words, by registering the phrase on the Supplemental Register, etc.). *Id.* ¶ 10.

The commercial strength of a trademark refers to whether "consumers

---

[8] An applicant's amendment of its application from the Principal Register to the Supplemental Register serves as an admission that the mark is merely descriptive.  *See In re Rosemount Inc.*, 86 U.S.P.Q.2d 1436, 1439 (T.T.A.B. 2008) (noting  that by seeking registration on the Supplemental Register, applicant concedes that its mark is merely descriptive); *see also In re Eddie Z's Blinds and Drapery, Inc.*, 74 U.S.P.Q.2d 1037, 1039 (T.T.A.B. 2005) ("[A]pplicant has, by its amendment, conceded that its proposed mark is merely descriptive . . . [.]").

have come to identify the trademark . . .  with a particular source." *Sunenblick v. Harrell*, 895 F. Supp. 616, 627 (S.D.N.Y. 1995) aff'd, 101 F.3d 684 (2d Cir. 1996). Additionally, source identification must be assessed by "looking to the national market as a whole, not just niches." *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 631 (S.D.N.Y. 2012). Courts look to a variety of factors when making this inquiry, including third-party use and survey evidence. *See id*. at 632 (stating that prevalent third-party use of the plaintiff's mark weakened its mark strength); *Sunenblick*, 895 F. Supp. at 627 (finding that the plaintiff's failure to produce a relevant survey was some evidence that the plaintiff's mark was commercially weak).

Here, it is undisputed that EA's mark is commercially weak. Dozens of third-party businesses use the term "edible arrangements" in connection with their products—ranging from Wal-Mart and Harry and David, to the Arlington Florist & Garden Center in North Arlington, New Jersey and Destiny's Precious Gifts in Salinas, California. SF ¶ 12. Additionally, EA did not produce a single survey in an attempt to show nationwide source identification with its mark. Absent a survey, a reasonable jury can conclude only that consumers have not come to identify EA's mark with a particular source.

Overall, EA's mark is descriptive and weak, and is entitled to a very narrow scope of protection. Thus, this factor weighs strongly in Provide's favor.

       **b.**    <u>**The Descriptive Terms Used by Provide are Not Similar to EA's Mark**</u>

The second *Polaroid* factor requires a court to analyze the similarity between the marks at issue. *Gruner + Jahr*, 991 F.2d at 1078. To determine if

confusion is likely, "each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar." *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984) (affirming summary judgment that taken as a whole, "Donkey Kong" does not create a likelihood of confusion with "King Kong").

Here, EA's mark is descriptive and weak, so other companies may thus use the terms "edible" and "arrangements" in marks to describe their products (i.e., other companies may come close to using the phrase "edible arrangements" without infringing EA's mark). *See Sure-Fit Prods. Co. v. Saltzson Drapery Co.*, 254 F.2d 158, 160 (C.C.P.A. 1958) (noting that where a party chooses an inherently weak trademark, it will not enjoy the wide latitude of protection afforded the owners of strong trademarks, and its competitors may come closer to its mark than would be the case with a strong mark without violating its rights). Provide's use of the descriptive phrase "edible fruit arrangements" is distinguishable from EA's mark because it was not used in a trademark sense, and because it contains the additional term "fruit," which EA's mark does not contain. Because EA's mark is so descriptive, this seemingly minor addition of the word "fruit" is sufficient to distinguish Provide's use from EA's mark. *See In re S.D. Fabrics, Inc.*, 223 U.S.P.Q. 54, 55-56 (T.T.A.B. 1984) (holding that the mark DESIGNERS/FABRIC was not likely to cause confusion with the mark DAN RIVER DESIGNER FABRICS, noting that because of the descriptive nature of the senior user's mark, the addition of "DAN RIVER" to the junior user's mark was sufficient to avoid a likelihood of confusion).

24

Additionally, Provide used its "house" brands (*e.g.*, Shari's Berries) with the phrase "edible fruit arrangements," which further distinguishes the use from EA's mark.[9] *Timex Corp. v. AAI.FosterGrant, Inc.*, No. 300-Civ-295, 2000 WL 1576396, at *11 (D. Conn. Sept. 14, 2000) aff'd, 8 F. App'x 94 (2d Cir. 2001) ("[T]he presence of the housemarks. . . on the packaging, advertisements, and products favors a finding that the two marks are sufficiently dissimilar.").

Overall, EA's mark is descriptive and weak, so Provide's use of the phrase "edible fruit arrangements" is sufficiently distinguishable from EA's mark such that confusion is unlikely. Thus, this factor weighs in Provide's favor.

### c.    Provide Does Not Dispute That the Parties' Products are Similar

The third *Polaroid* factor requires analysis of the similarity between the parties' products at issue. *Savin Corp.*, 391 F.3d at 458. Here, Provide does not dispute that its fruit products are similar to EA's fruit products. Nevertheless, this factor should not weigh heavily in the analysis because the products that are similar are exactly the products that are described both by EA's mark and by the descriptive phrase used by Provide. Indeed, this is the crux of the issue.

### d.    EA Has Not Identified Any Actual Confusion

The fourth *Polaroid* factor requires a court to analyze any existing evidence of actual confusion. *Penta Hotels Ltd. v. Penta Tours*, No. 86-Civ-089, 1988 WL

---

[9] It is notable that EA's First Amended Complaint also asserts two versions of its mark that contain design elements; of course, those marks are even further distinguishable from Provide's use of the phrase "edible fruit arrangements," due to the distinctive designs in EA's asserted marks. *See First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 653 (10th Cir. 1996) (stating that the existence of a graphical logo to a weak word mark supported a finding of no likelihood of confusion).

384940, at *33 (D. Conn. Sept. 30, 1988) (noting that evidence of actual confusion is the best evidence of likelihood of confusion). "In general, a plaintiff may prove actual confusion by evidence of specific incidents or by market research surveys." *Id*. Here, in the at least six years that EA has known about Provide's keyword advertising activities (including the two years since EA filed its complaint), EA has not identified any evidence of actual confusion.

*First*, EA has not offered any survey evidence showing a likelihood of confusion. It is well-established that "a failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown." *Essence Commc'ns, Inc. v. Singh Indus., Inc.*, 703 F. Supp. 261, 269 (S.D.N.Y. 1988). *See also Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) (stating that the plaintiff's knowledge for two years of the defendant's allegedly infringing activity was ample time to produce evidence of actual confusion, such as through a survey, and this absence weighs against the plaintiff). This absence of survey evidence weighs against EA.

*Second*, EA has not identified any anecdotal evidence of actual confusion. In an attempt to establish such evidence, EA produced records of six phone calls between consumers and EA's customer service department. SF ¶ 73. The consumers had called regarding the statuses of certain orders that they either were placing or had placed; over the course of those calls, the EA representatives suspected (but were unable to confirm in every case) that the consumers were attempting to place or may have actually placed their orders with other companies, and not with EA. *Id*. The records do _not_, however, reflect: (i) the years

that the orders and/or calls were placed; (ii) whether the orders originated with the consumers clicking on one of Provide's keyword advertisements;[10] and (iii) that at the time of the purchases, the consumers actually made the purchases believing that they were purchasing the products through EA, but were actually purchasing the products through a different company. *Id*. ¶ 74.

At a minimum, because the records are missing information that would be critical to determine whether actual confusion actually occurred, the records reflect merely misdirected calls and not actual confusion. *Nautilus Grp., Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330, 1338 (Fed. Cir. 2004) (noting that four misdirected phone calls out of thousands is a "relatively small number" and is "too unreliable to establish actual confusion"). *Publ'g Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 386–90 (S.D.N.Y.1985), *aff'd without op.*, 788 F.2d 3 (2d Cir.1986) ("anecdotal evidence" of misdirected telephone calls and inquiries were not proof of confusion of consumers contemplating a purchase).

Moreover, regardless of the nature of the calls, such a small number of anecdotes is insufficient evidence of actual confusion when weighed against EA's substantial market success. *Alzheimer's Found. of Am., Inc.*, 2015 WL 4033019 at *9 ("[A] small handful of anecdotes, accompanied by assertions that they are representative of a larger number of incidents . . . is insufficient to establish the presence of actual confusion, particularly when weighed against the

---

[10] The fact that a consumer may have accidentally called the wrong company to check on an order is not evidence of confusion related to keyword advertising when there is no evidence that the consumer in question actually ran a keyword search. The evidence in this case utterly fails to draw this nexus.

27

nearly $100 million in successful donations that [Plaintiff] receives annually.”).

Here, in 2013 alone, EA achieved more than *$500 million* in sales. SF ¶ 15. No

reasonable jury could find that such a small number of misdirected calls—

weighed against billions of dollars in sales—represents actual confusion.

*Third*, Provide is not aware of any instances of actual confusion. SF ¶ 75.

*Am. Republic Ins. Co. v. N. Am. Adm’rs, Inc.*, No. 95-Civ-1004, 1996 WL 291983, at

*6 (W.D.N.Y. May 21, 1996) (“The lack of any instances of  actual confusion

combined with the defendants’ evidence of no confusion over a several-year

period weighs against [plaintiff] and a finding of a likelihood of confusion.”)

Overall, because EA has not provided any survey evidence or anecdotal

evidence of actual confusion, this factor weighs heavily in Provide’s favor.

### e.   Provide Acted in Good Faith

The fifth *Polaroid* factor requires a court to analyze whether the defendant

acted in good faith when using the mark. *Penta Hotels Ltd.*, 1988 WL 384940, at

*32.  “A plaintiff in a trademark infringement action need not prove intent to

infringe; however, intent to exploit the goodwill created by an already existing

mark has been held to create a presumption of likelihood of confusion.” *Id.*; *see

also Wonder Labs, Inc. v. Procter & Gamble Co.*, 728 F. Supp. 1058, 1064 (S.D.N.Y.

1990) (finding that the defendant’s descriptive fair use of a mark showed a lack of

bad faith). A defendant’s intent in the keyword advertising context, though, must

be analyzed beyond merely the intent to use a mark at issue. *CollegeSource*, 2012

WL 5269213 at *19 (stating that knowledge of the plaintiff’s marks was insufficient

to infer an intent to capitalize on the plaintiff’s goodwill because the defendant

could have used the mark to “truthfully inform consumers of their choice of

28

products"); *see also Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011) (stating that the District Court erred by weighing in favor of the plaintiff without considering whether the defendant intended to truthfully inform its consumers rather than deceive them).

Here, as explained above, Provide acted in good faith under the legitimate belief that it lawfully used the phrase "edible fruit arrangements" to describe its products. SF ¶¶ 5, 22-27.  Provide acted in good faith ever since EA first approached Provide in 2010; at that time, and since then, Provide has maintained that it has acted lawfully because it used the phrase only in a descriptive sense, and not as a trademark. SF ¶¶ 28-40. *See Dessert Beauty*, 568 F. Supp. 2d at 427 (finding defendant's consistent assertion of descriptive fair use in response to plaintiff's repeated cease-and-desist letters was strong evidence of good faith). Nothing in the record could support a reasonable jury finding that Provide has created (or even attempted to create) confusion as to source or sponsorship.

Overall, because the factual record demonstrates that Provide acted in good faith in using the phrase "edible fruit arrangements," and EA has presented no evidence to the contrary, this factor weighs heavily in Provide's favor.

        f.      <u>The Parties' Products Are of High Quality</u>

The sixth *Polaroid* factor requires a court to analyze the quality of the parties' respective products, and is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality. *Arrow Fastener Co.*, 59 F.3d at 397. This factor requires affirmative factual findings to support the conclusion that a defendant's products are of inferior quality. *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d

29

373, 389 (2d Cir. 2005) (stating that mere allegations of inferior quality and lower costs of the defendant's products is insufficient to support a finding of inferior quality); *Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 313 (S.D.N.Y. 2010) ("[N]othing in the record suggests that defendants' products are of inferior quality. Accordingly, this factor is entitled to no weight.").

Here, both Provide and EA sell high-quality gifts for special occasions. SF ¶¶ 4, 15. Provide's products include gourmet dipped berries, handmade brownie pops, and organic fruit baskets. *Id*. ¶¶ 1, 2. Likewise, EA sells high-quality fruit arrangements. *Id*. ¶ 15. Overall, because it is undisputed that both parties sell high-quality products, this factor weighs in Provide's favor.

### g.    The Parties' Consumers Are Sufficiently Sophisticated

The seventh *Polaroid* factor requires a court to analyze whether the consumers who purchase the parties' products are sophisticated. *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). In general, the more sophisticated the consumers, the less likely that they will be confused. *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1007 (2d Cir. 1983) (stating that consumers of high-quality vitamins, minerals, and food fortifiers are sophisticated consumers). Here, both EA's and Provide's consumers are individuals seeking to purchase high-quality gifts for special occasions. SF ¶¶ 4, 15. These consumers typically purchase the products online, through each company's respective website. *Id*. ¶ 4. The antiquated argument that Internet consumers can be easily confused is no longer legitimate. *See Network Automation*, 638 F.3d at 1152 (noting that the degree of consumer care is

30

becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace); *see also CollegeSource*, 2012 WL 5269213 at *18 ("The modern Internet user's increasing level of experience with search sites decreases the likelihood that they would be confused by the advertisements [due to keyword bidding].").

Overall, there is no evidence in the record to suggest that the parties' consumers are not sufficiently sophisticated to exercise care in making their purchases. As a result, this factor weighs slightly in Provide's favor. In any event, however, it is a factor that should not weigh heavily in the analysis in this case because the other factors are far more persuasive.

The foregoing analysis of the *Polaroid* factors reveals that the majority of the factors favor Provide, and thus there is no likelihood of confusion as a result of Provide's fair use of the descriptive phrase "edible fruit arrangements" in the text of its keyword advertisements.

### 3. *Provide's Bidding on "Edible Arrangements" as a Non-Consumer Facing Keyword Does Not Create a Likelihood of Confusion with EA's Mark*

Not one court in the entire country has ever held a defendant liable for trademark infringement by finding a likelihood of confusion based solely on the defendant's keyword bidding. This case should be no different. Indeed, the undisputed factual record demonstrates that Provide's bidding on the term "edible arrangements" as a non-consumer-facing keyword does not create a likelihood of confusion with EA's mark.

To determine whether a likelihood of consumer confusion exists when a competitor uses a trademark to purchase keywords, the majority of courts at the

31

district level apply the *Polaroid* factors or their Circuit's equivalent. *Alzheimer's Found. of Am.*, 2015 WL 4033019 at *6 (noting that "[c]ompanies can and do regularly purchase other companies' marks as search keywords and use those companies' trademarks in the text of their search advertising in order to draw a contrast with the searched-for product and offer their own as an alternative").

Here, the analysis of five out of the seven *Polaroid* factors is identical to the above analysis of those factors in the context of Provide's fair use of the descriptive phrase "edible fruit arrangements" in the text of its keyword advertising. Thus, for purposes of analyzing those factors in the context of Provide's bidding on the non-consumer-facing keyword "edible arrangements," Provide incorporates the above analysis and conclusions that:

> (i) EA's mark is weak and descriptive, so the "strength of the plaintiff's mark" factor weighs in Provide's favor;
>
> (ii) the parties' products are similar, but that is because the words in question are fundamentally descriptive. As a result, the "proximity of the products" factor should not weigh heavily in the analysis in this case;
>
> (iii) there is no survey or legitimate anecdotal evidence of confusion, so the "actual confusion" factor weighs in Provide's favor;
>
> (iv) the parties' products are high quality, so the "product quality" factor weighs in Provide's favor; and
>
> (v) the parties' consumers are sufficiently sophisticated and make relatively careful purchasing decisions, so the "sophistication of the consumers" factor weighs slightly in Provide's favor.

The only factors requiring separate analysis here are: (i) the degree of similarity between the competing marks; and (ii) the defendant's good faith. Here, both factors weigh in Provide's favor.

*First*, Courts have held that the "degree of similarity" between the marks factor is inapplicable to non-consumer-facing keyword bidding. *See, e.g.*, *Network Automation*, 638 F.3d at 1151 (stating that such an inquiry was "impossible" when a consumer is not faced with two distinct trademarks).

*Second*, Provide has acted (and continues to act) in good faith under the legitimate belief that it is lawfully using EA's mark when bidding on the keyword "edible arrangements." SF ¶¶ 28-40. Provide has acted in good faith ever since EA first approached Provide in 2010; at that time, and since then, Provide has maintained that it has acted lawfully because not one court in this entire country has ever held a defendant liable for trademark infringement by finding a likelihood of confusion based solely on the defendant's keyword bidding. *See Dessert Beauty*, 568 F. Supp. 2d at 427 (finding that the defendant's consistent assertion of descriptive fair use in response to the plaintiff's repeated cease-and-desist letters was strong evidence of good faith). When confronted with Provide's assertion that its keyword bidding was lawful, EA did not inform Provide of any court decision to support its accusations. SF ¶¶ 28-40. Nothing in the record could support a reasonable jury finding that Provide has created (or even attempted to create) confusion as to source or sponsorship.

It is clear that the mere act of Provide's bidding on the non-consumer-facing keyword "edible arrangements" cannot result in a likelihood of confusion. This conclusion is supported by judicial opinions throughout the country—again, *not one court* has ever held a defendant liable for trademark infringement by finding a likelihood of confusion based solely on the defendant's keyword

bidding. Recently, the United States District Court for the Central District of

California summarized the current state of the case law across the country:

> There is a growing consensus in the case authorities that keyword advertising does not violate the Lanham Act. . . . [Including] [t]hose purchasing trademarked keywords for the purpose of competitive keyword advertising . . . . *See, e.g., Network Automation, Inc. v. Advanced System Concepts, Inc.*, 638 F. 3d 1137 (9th Cir. 2011) (finding no likelihood of confusion after applying factor test, focusing most heavily on the strength of plaintiff's mark, lack of evidence of actual confusion, type of goods and degree of care likely to be exercised by the purchaser, and the labeling and appearance of advertisements and the surrounding context on the screen displaying the results page); *Infostream Group Inc. v. Avid Life Media Inc.*, No. CV 12-09315 DDP, 2013 WL 6018030 (C.D. Cal. Nov. 12, 2013) (granting defendant's motion to dismiss plaintiff's trademark infringement claim, holding that defendant's purchase of plaintiff's trademark as a keyword ad trigger does not lead to customer confusion); *CollegeSource, Inc. v. AcademyOne, Inc.*, No. 10-3542, 2012 WL 5269213 (E.D. Pa., Oct. 25, 2012) (finding no likelihood of confusion where the surrounding ad context, including separation of sponsored ad links and labeling of sponsored links, decreased any potential likelihood of confusion); *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, No. 06-0597, 2007 WL 30115 (E.D. Pa., Jan. 4, 2007) (finding defendant's purchase of plaintiff's trademarks as keyword ad triggers for Google's AdWords program did not result in any actionable likelihood of confusion because of the separate and distinct nature of the links created on the search results page).

*Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*, No. 10-Civ-03738, 2015

WL 5311085, at *50 (C.D. Cal. Sept. 10, 2015). Indeed, Provide's keyword bidding

is the same as the bidding analyzed in the above-quoted cases where courts

found no infringement; thus, this case should not be treated any differently.

The foregoing analysis of the *Polaroid* factors reveals that each factor

favors Provide, and thus there is no likelihood of confusion as a result of

Provide's bidding on the term "edible arrangements." Therefore, Provide is

entitled to summary judgment on EA's infringement claims.

## B.   Provide's Keyword Advertising Does Not Dilute EA's Mark

EA's dilution claim suffers from the same shortcomings as its infringement claim: EA cannot show any evidence that Provide diluted EA's mark. Dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services." 15 U.S.C. § 1125; *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003). The Trademark Dilution Revision Act ("TDRA") "allows the owner of a 'famous mark' to enjoin a person from using 'a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark.'" *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 110–11 (2d Cir. 2010) (quoting 15 U.S.C. § 1125(c)(1)). To plead dilution under the TDRA, a trademark owner must allege four elements: (i) that the mark is famous; (ii) that the defendant is making use of the mark in commerce; (iii) that such use began after the mark became famous; and (iv) that there is a likelihood of dilution as a result of the defendant's use. *Heller Inc. v. Design Within Reach, Inc.*, No. 09-Civ-1909, 2009 WL 2486054, *3 (S.D.N.Y. Aug.15, 2009). EA's mark is not "famous," and regardless, EA cannot show any actual or likely dilution by blurring or tarnishment.

### 1.   *EA's Mark is Not Famous*

As a preliminary matter, EA's mark does not come even close to the level of fame required to be subject to dilution. *See, e.g., Savin Corp.*, 391 F.3d at 449. A mark is "famous" under the TDRA only if it is "*widely recognized by the general consuming public of the United States* as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis added). The standard for fame is an extremely high bar, reserved for truly household names such as TOYOTA, KODAK, and ROLLS-ROYCE. *See* J.T. McCarthy, *The 1996*

35

*Federal Anti-Dilution Statute*, 16 Cardozo Arts & Ent. L.J. 587, 592 (1998);

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 205 (2d Cir. 2013);

*see also Res. Lenders, Inc. v. Source Solutions, Inc.*, 404 F. Supp. 2d 1232, 1248

(C.D. Cal. 2005) ("Dilution usually protects marks such as 'KODAK,' 'BUICK,' and

'COCA-COLA' that are well-known to the general public to the point of being

household names."). In fact, courts have found that even popular, well-known

brands such as COACH, DAVID'S BRIDAL, and AVERY-DENNISON have failed to

reach the level of fame required for dilution protection. *See Coach Servs., Inc. v.

Triumph Learning LLC*, 668 F.3d 1356, 1374-76 (Fed. Cir. 2011); *David's Bridal,

Inc. v. House of Brides, Inc.*, No. 06-Civ-5660, 2010 WL 323306, at *9 (D.N.J. Jan.

20, 2010); *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875-77 (9th Cir. 1999).

EA's mark does not even come <u>*close*</u> to meeting the level of fame required

to support a claim for dilution. Based on factors outlined in the TDRA, courts in

the Second Circuit generally have limited famous marks to those that receive

multi-million dollar advertising budgets <u>*and*</u> are almost <u>*universally recognized by

the general public*</u>. *See Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12-Civ-

8205, 2013 WL 3943267, at *10 (S.D.N.Y. July 31, 2013) (granting motion to dismiss

because the plaintiff's mark was not famous outside of the luxury jewelry

market); *GMA Accessories, Inc. v. Croscill, Inc.*, No. 06-Civ-6236, 2008 WL 591803,

*9-10 (S.D.N.Y. March 3, 2008) (granting summary judgment because the plaintiff's

registered mark was "not sufficiently famous to qualify for protection" under the

dilution statute where consumer recognition was limited).

EA has provided no evidence that its mark is universally recognized by the general public. And because no reasonable jury could conclude that EA's mark is famous under this high standard, EA's claim for dilution fails as a matter of law.

### 2. *EA Has Not Established Any Actual or Likely Dilution by Blurring or Tarnishment*

Even assuming that EA's mark is famous (which it is not), EA has offered no evidence of actual or likely dilution by blurring or tarnishment.

Dilution by blurring "is association arising from the similarity between a mark . . . and a famous mark that impairs the distinctiveness of the famous mark," 15 U.S.C. § 1125(c)(2)(B), such that the defendant's use diminishes the capacity of the famous mark to identify and distinguish goods by "uniquely signify[ing] one source." *Savin Corp*., 391 F.3d at 448-49. Dilution by tarnishment is the "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark," 15 U.S.C. § 1125 (c)(2)(C)(1), which "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Deere & Co. v. MTD Prods*., 41 F.3d 39, 43 (2d Cir. 1994).

EA has not identified any evidence suggesting that Provide's use of the descriptive phrases "edible fruit arrangements" and "edible arrangements" in its keyword advertising lessens the capacity of (or is likely to lessen the capacity of) EA's mark as an identifier of EA's goods and services. EA has not conducted any surveys, presented consumer evidence, or otherwise shown any evidence of actual or likely dilution. The handful of reports of misdirected calls to EA's

customer service department are insufficient to show actual or likely dilution, particularly considering EA's hundreds of millions of dollars in sales per year. SF ¶¶ 15, 73-75. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415, 449 (S.D.N.Y. 2004) *aff'd in part,* 454 F.3d 108 (2d Cir. 2006) (finding six customer emails alleged to evidence dilution insufficient in light of sales volumes).

Moreover, there is no evidence that Provide's high-quality products are counterfeits, reproductions, copies, or colorable imitations, as EA alleges in its First Amended Complaint. SF ¶ 5.  Provide's house brands, including Shari's Berries, are well-known, successful gifting companies with high-quality products. *Id*. ¶¶ 1, 2. EA has shown no evidence that any of EA's brand equity has diminished because of any of Provide's actions.

Therefore, because EA's mark is not famous and EA has not identified any evidence of actual or likely dilution, Provide is entitled to summary judgment on EA's dilution claim.

C.    <u>Provide Is Not Cybersquatting</u>

Even after discovery, EA cannot substantiate its cybersquatting claim. Specifically, EA cannot show that Provide registered, trafficked in, or uses the domain names at issue.[11] Under the ACPA, a defendant may be liable only if it "has a bad faith intent to profit from [the plaintiff's] mark ... and registers, traffics

---

[11] It is notable that even if EA were to somehow prevail on its ACPA claim, Provide does not even have the ability to give EA the relief it seeks (transfer of the domain names). Because Provide does not own or control the domain names, it has no means by which to transfer the domain names to EA. *Id*. ¶ 69.

in, or uses a [protected] domain name." 15 U.S.C. § 1125(d)(1)(A).[12]

Here, Provide cannot be liable for cybersquatting because it did not

register, traffic in, or use the domain names. SF ¶ 46. Provide has demonstrated

this fact to EA *repeatedly*:

- Counsel for Provide contacted counsel for EA and explained that Provide did not register, own, or control the domain names.

- After receiving a threatening letter from EA restating its ACPA claim, Provide's counsel sent correspondence reiterating that Provide does not own or control the domain names.

- Provide filed its Answer to EA's First Amended Complaint, formally denying ownership and control of the domain names.

- At the parties' Rule 26(f) conference, Provide again notified EA's counsel that Provide does not own or control the domain names.

- Provide concurrently took several actions that EA should have taken to determine the true registrants, including contacting the registrar, privacy service, and the digital advertising companies.[13]

*Id*. ¶¶ 48, 49, 52-56, 60-62, 68.

Notably, Provide moved for judgment on the pleadings on EA's

cybersquatting claim over a year-and-a-half ago, on the basis that EA sued the

wrong party (Provide) and therefore failed to join certain indispensable parties—

the actual domain name registrants and privacy services that shielded the

registrants' identities. SF ¶ 66. The Court denied the motion, and concluded that

---

[12] Additionally, there is no secondary liability for cybersquatting. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 177-178 (1994) ("We cannot amend the statute to create liability for acts that are not themselves [prohibited] within the meaning of the statute.").

[13] Provide's actions to determine the true registrant were not successful, likely because Provide is a third-party victim, not the party alleging infringement (and thus entitled to the information).

"discovery [would] uncover the nature of [Provide's] relationship to both the privacy services and the true registrant(s) of the typosquatting domains." *Id*. ¶ 67.[14]  However, after a lengthy discovery period, EA has not identified any evidence that Provide registered, trafficked in, or used the domain names, or that Provide maintains any relationship with the privacy services or registrants. In fact, the factual record regarding these domain names remains the same as the day that EA alleged its ACPA claim. Any evidence that has been uncovered through discovery only demonstrates further that Provide has not been involved in the registration, trafficking, or use of the domain names at issue.

Moreover, because Provide has had no involvement in the registration, trafficking, or use of the domain names, it certainly has not had any bad faith intent to profit from EA's mark. The record is devoid of any such evidence. Therefore, Provide is entitled to summary judgment on EA's ACPA claim.

## IV.   CONCLUSION

The undisputed factual record demonstrates that EA cannot prevail on any of its claims. As a result, Provide respectfully requests that the Court grant Provide's Motion for Summary Judgment in its entirety.

---

[14] EA could have (and indeed, should have) sought an order by a UDRP or court of competent jurisdiction before it filed its ACPA claim, so that the registrars and privacy services would have been required to reveal the true registrants of the domains. In fact, Fabulous.com, one of the registrars, admitted this in its response to Provide, refusing to reveal the registrant's identity. SF ¶¶ 63, 64.

February 29, 2016                          Respectfully submitted,

FISH & RICHARDSON P.C.

_/s/ R. David Hosp_

R. David Hosp, *pro hac vice*
One Marina Park Drive
Boston, MA 02210
Telephone: (212) 765-5070
Facsimile:  (212) 258-2291
hosp@fr.com

Elizabeth E. Brenckman, *pro hac vice*
601 Lexington Avenue, 52nd Floor
New York, NY 10022
Telephone: (212) 641-2305
brenckman@fr.com

ST. ONGE STEWARD JOHNSTON &
REENS, LLC

Gene S. Winter, ct05137
Jonathan A. Winter, ct29316
986 Bedford Street
Stamford, CT 06905-5619
Telephone: (203) 324-6155
Facsimile: (203) 327-1096
gwinter@ssjr.com
jwinter@ssjr.com
litigation@ssjr.com

*Attorneys for Defendant Provide Commerce, Inc.*

41

## CERTIFICATE OF SERVICE

**This is to certify that a true and accurate copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.**

**Date: February 29, 2016**                              ***/s/ R. David Hosp***
                                                                    **R. David Hosp**