**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **EDIBLE ARRANGMENTS, LLC and** | : | **CIVIL ACTION NO.** |
| **EDIBLE ARRANGEMENTS** | : | **3:14-CV-00250 (VLB)** |
| **INTERNATIONAL, LLC** | : | |
|     **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PROVIDE COMMERCE, INC.,** | : | |
|     **Defendant.** | : | **July 29, 2016** |

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #116]**

**I.    Introduction**

The Plaintiffs, Edible Arrangements, LLC, and Edible Arrangements International, LLC, ("EA") bring this action against Defendant Provide Commerce, Inc. ("Provide"), alleging trademark infringement in violation of 15 U.S.C. § 1114(1)(A) (Count I); false designation of origin or sponsorship and unfair competition in violation of 15 U.S.C. § 1125(A) (Count II); trademark dilution in violation of 15 U.S.C. § 1125(C) (Count III); common law trademark infringement (Count IV); unfair competition and deceptive trade practices in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. 42–110b(a) et seq. ("CUTPA") (Count V); and violations of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(D) ("ACPA") (Count VI).  Currently pending before the Court is the Defendant's Motion for Summary Judgment.  For the reasons that follow, the Defendant's Motion for Summary Judgment is GRANTED

IN PART with respect to EA's ACPA (Count VI) claim AND DENIED IN PART with respect to all other claims (Counts I – V).

## II.   Factual Background

### a.  The Parties

Plaintiff EA is a leading seller in the United States and internationally in artfully designed fresh fruits that are sculpted in the shapes of flowers and arranged to resemble floral arrangements.  EA also sells "gourmet, chocolate Dipped Fruit™, fruit salads, and fruit-based beverages."  [Def.'s Mem. at 3].

Defendant Provide is a direct competitor of the Plaintiff which sells a variety of gift products including flowers, chocolates, fresh fruit, gift baskets, and personalized gifts under brands such as "ProFlowers," ProPlants," "RedEnvelope," "Personal Creations," "Shari's Berries," and  Cherry Moon Farms."  [Dkt. 118, Def.'s Rule 56(a)(1) Statement ("SOMF") ¶ 1.  Particularly relevant to this case is Provide's brand Shari's Berries, which offers a variety of items through its online store at <www.berries.com>, including "hand-dipped strawberries, cherries, and apples; hand-decorated cake pops; handmade s'mores; and pretzels hand-dipped in caramel and coated with decadent toppings."  [Id. ¶ 2].

Provide does not sell shaped fruit or fruit that is packaged to resemble floral arrangements.  [Dkt. 119, Ex. 2; Pl.'s R. 56(a)(2) Statement ¶ 9].  Provide does sell coated fruit products that compete directly with some of EA's "Dipped Fruit™" products.  [Dkt. 136, Ex. N.].  EA argues that its coated fruit products are

superior because EA uses real chocolate in its fruit coatings, while Provide uses imitation chocolate.  [Dkt. 136, Ex. O, Ex. P].  Nonetheless, neither party appears to dispute that Provide and EA are direct competitors in the market for chocolate and fruit-based gift packages.  [Dkt. 119, Ex. 2; Pl.'s Mem. at 5].

### b. EA's Mark and Its Use

EA has advertised, marketed and sold its fresh fruit products ("the EA Goods") under the trademark "EDIBLE ARRANGEMENTS" ("the EA Mark") since 1998.  [Dkt. 136, Ex. A ¶2.].  EA has been granted "multiple U.S. registrations for the EA Mark," including at least two registrations on the U.S. Patent and Trademark Office's ("USPTO") principal register, since as early as 2005, at U.S. Reg. Nos. 3844160 and 2934715.  [Dkt. 136, Ex. B].  EA's mark has also been in continuous use for seventeen years.  [Pl.'s R. 56(a)(2) Statement ¶ 3].  EA admits that there have been "numerous attempts" to plagiarize the mark, which have resulted in "aggressive polic[ing]" by EA in the form of cease and desist letters sent to more than a dozen companies using the mark and at least one lawsuit. [Id. ¶¶ 12-13].

### c. Keyword Advertising

"Keyword advertising" is a common method of advertising used by companies to market their products through programs offered by Internet search engines such as Google, Bing, and Yahoo.  [Def.'s R. 56(a)(1) Statement ("SOMF")

¶ 16].  The premise behind keyword advertising is that companies wish to have their advertisements appear when consumers use search engines to search for particular terms.  [Id. ¶ 17]. To ensure that their advertisements appear when consumers search for particular terms, companies pay fees to the search engines by "bidding" on those terms.  [Id. ¶ 19].  Consumers searching via Google, Bing, and Yahoo have no way of knowing which particular terms advertisers have bid on; thus, keyword bidding is often referred to as "non-consumer-facing."  [Id. ¶ 20].

An example offered by the defendant would be the following scenario: when a consumer enters "Pizza Hut pizza" into a search engine, competitors such as Papa John's, Domino's, and Little Caesars wish to have their advertisements appear on the results page so that the consumers may have easy access to their websites and purchase their pizza.  Such companies would thus need to bid on keyword terms such as "pizza," "Pizza Hut," "Domino's," "Papa John's," and "Little Caesars."  Figure I, below, depicts this scenario.

*Figure I.*



Provide notes that it bids on thousands of terms, including some terms that describe its products, such as "fruit," "dipped berries," "edible fruit," "flowers for moms," "Valentine's birthday cake," "fruit bouquets," and "edible arrangements."  [Id. ¶ 23].  Provide also bids on EA's mark as a keyword, so that consumers searching for "edible arrangements" would see an ad for a Provide gift-seller.  [Id. ¶ 22].  In addition, EA notes, that Provide bids on keywords related to EA that clearly are not descriptive of any Provide product, including "edible arrangements locations," "edible arrangements coupons," "edible arrangements promotional code," "edible arrangements bouquet," "edible arrangements

flowers," "cheap edible arrangements," "edible arrangement discount," and "incredible edible arrangements."  [*See* Dkt. 136, Ex. X, Ex. Y, Ex. Z].

### d. Provide's Consumer-Facing Advertisements

Because of Provide's purchase of the EA Mark as a keyword, when a consumer would search for "edible arrangements," Provide's ad would populate in the search results as an "Ad related to edible arrangements" and that exact text appears at the top of Provide's advertisement.  [Dkt. 119, Ex. 25].  Beneath the text that reads "ad related to edible arrangements," the consumer would then see the text of Provide's actual advertising slogan(s).  Prior to 2010, Provide used the phrase "edible arrangements" to describe its products in its advertising slogans.  Sometime after receiving a cease and desist letter from EA in February, 2010, Provide began using variations of the mark, including "Edible Fruit Arrangements" (e.g., "Save More Than 50% On Edible Fruit Arrangements").[1] [SOMF ¶ 24.  These advertisements are the subject of the instant suit.

Provide highlighted the term "Edible Fruit Arrangements" in its advertisements in that the text containing that phrase was larger, underlined and in a different color than that the font used in the rest of the advertisement.  *See* Figure I, *infra*.  Provide claims that it only used this phrase "in close proximity to its own brands, such as ProFlowers or Shari's Berries."  [Id. ¶ 27].  However, EA

---

[1] Provide also used EDIBLE ARRANGEMENTS as a keyword for products completely unrelated to fruit – namely the ProFlowers floral products – because the keyword "results in sales."  [*See* Ex DD., Two Dep. Tr. at 217:1-18].

has provided an example of at least one such advertisement in which "Provide's brand names – ProFlowers, Shari's Berries and Cherry Moon Farms – did not appear anywhere in the ad except for the [URL] website address."  [Dkt. 119, Ex. 5].  Moreover, the web address appears in smaller text beneath EA's mark and does not necessarily identify the seller as a particular brand.  [Id.].  The Provide advertisement that is cited by EA as an example appears below at Figure II. Provide claims that it no longer uses the phrase "Edible Fruit Arrangements" in its advertisements.

*Figure II.*



Ad related to **"edible arrangements"** ⓘ
Edible Fruit Arrangements - Delicious Fruit Gifts 20% Off
www.proflowers.com/Fruit.Gifts ▾ 4.2 ★★★★☆ advertiser rating
Guaranteed On-Time Delivery!

  e. *Provide's "Competitor" Marketing Campaign and EA's Evidence of Confusion*

EA argues that in internal records, Provide identified EA as one of its biggest competitors and engaged in a marketing campaign described as the "Edible Arrangements Campaign" that is also labeled "competitor" (hereinafter "the Competitor Campaign").  [Dkt. 136, Ex. AA, Ex. BB, Ex. CC at PC2828 (referencing "Edible Arrangement keyword set"), Ex. T, Ex. U].  Provide's Manager of Search Engine Marketing, Charles Twu, acknowledged that the

purpose of the EA Competitor Campaign was to generate revenue by driving traffic to Provide's competing websites.  [Ex. DD, Twu Dep. Tr. 199:4-200:5].

Keyword bidding on variations of the term "edible arrangements" is one of Provide's most successful tools for converting sales.  [*See* Dkt. 136, Ex. BB, Ex. FF at PC2767, Ex. GG at PC2305].  In one document reviewing Provide's 2012 Mother's Day promotions, "'EDIBLE ARRANGEMENTS" is the top generator of "impressions" for Shari's Berries.  [Dkt. 136, Ex. EE at PC_0002774].  An "impression" occurs when an advertisement is displayed on a potential consumer's search results page.  [See Ex. DD, Twu Dep. Tr. 43:16-18].  EA argues that Provide's "Competitor Campaign" has in turn generated numerous "conversions" for Provide.  [Dkt. 133, Pl.'s R. 56(a)(2) Statement ¶ 20].  A "conversion" occurs when a consumer clicks on an ad and places an order.  [Id.].

EA sent a letter to Provide on February 9, 2010, objecting to Provide's use of the phrase "edible arrangements" in "advertising several competing goods and services."  [SOMF ¶ 29].  On March 25, 2010, Provide tacitly admitted that it used the phrase in its response, explaining the steps it had taken to ensure that the exact phrase "edible arrangements" would no longer appear in the text of its advertisements displayed through the Google AdWords program.  [Id. ¶ 35]. Four, years later, on February 6, 2014, EA sent another letter to Provide, again objecting  to Provide's: (i) purchase of the phrase "edible arrangements" as a non-consumer-facing keyword through the Google AdWords and Bing Ads programs; and (ii) use of the phrase "edible fruit arrangements" in the text of its advertisements displayed through the Google AdWords and Bing Ads programs.

8

[Id. ¶ 39].  Two weeks after EA's second letter, EA filed the instant action against Provide.

During discovery, EA produced call log records of seven telephone calls from consumers to its customer service department inquiring about the status of orders which were not placed with EA.  EA representatives suspected (but were unable to confirm in every case) the consumers were instead attempting to place or may have actually placed an order with companies affiliated with Provide. [SOMF ¶¶ 73-74].  The records of these seven calls do not reflect whether the orders in question originated with the consumer clicking on one of Provide's keyword advertisements.  [Id. ¶ 74].


### f.  Provide's Alleged Cybersquatting

In early 2014 EA became aware of several "typosquatting" domains – web addresses similar to EA's web address and mark but using deliberate misspellings – including edibelarrangements.com, ediblearangements.com, and ediblearragements.com (hereinafter the "Typosquatting Domains").  [See Dkt. No. 32 at ¶24].  It is undisputed that the registrants of the Typosquatting Domains are foreign domain privacy services, including a Panamanian entity known as Fundacion Private Whois ("Fundacion") and an Australian entity known as "Whois Privacy Services Pty Ltd." ("Whois Privacy").[2]  [See Dkt. No. 53-3; 53-4;

---

[2] The parties dispute whether EA is able to subpoena the entities in the United States or file a Uniform Domain Name Resolution Policy ("UDRP") action in order

53-5].  It is also undisputed that Provide did not register the domain names.
[SOMF ¶ 46].

EA asserts, however, that *agents* of Provide control the domain names.
Specifically, EA contends that Provide hired two digital marketing companies in
late 2013 to increase its web traffic – adMarketplace, Inc. and 7Search, Inc.  [*See*
Dkt. 136, Ex. KK, (adMarketplace contract); Ex. LL, pp. 21-28 (invoices)].  The two
companies placed advertisements on the Typosquatting Domains and redirected
traffic landing at the domains to Provide's own websites.  During discovery, EA
obtained records showing that the Typosquatting Domains redirected to
berries.com over 1700 times and that the redirections appeared to occur through
adMarketplace and 7search.  [*See* Dkt. 136, Ex. II; Ex. EE].  Provide admits that it
"suspects" the two companies "may have been involved in the redirection of the
domain names."  [SOMF ¶ 56].  Provide sent letters to both companies instructing
them to discontinue the redirection of traffic to Provide's websites.  [Id. ¶ 57].  EA
claims that the redirection of traffic from the Typosquatting Domains ceased
immediately thereafter.

### III.    Legal Standard

Summary judgment should be granted "if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment

---

to reveal the true registrant.  EA argues that neither measure would be effective.
[Pl.'s Mem. at 11, n. 13].

as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence

offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).


IV.    <u>Discussion</u>

   a. <u>EA's Claim for Trademark Infringement</u>

   To succeed on its trademark infringement claim, EA must prove that: (i) "its mark is entitled to protection," and (ii) "even more important, that the defendant's use of its own mark will likely cause confusion with the plaintiff's mark." *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993).  This same test also applies to EA's claims for: (i) federal trademark infringement under 15 U.S.C. § 1114; (ii) federal false designation of origin and unfair competition under 15 U.S.C. § 1125(a); (iii) common law trademark infringement; and (iv) state unfair competition and deceptive trade practices under Conn. Gen. Stat. 42-110b(a).  *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (applying the two-prong test to claims under 15 U.S.C. §§ 1114, 1125(a)); *Verilux, Inc. v. Hahn*, No. 05-Civ-254, 2007 WL 2318819, at *10 (D. Conn. Aug. 10, 2007) (test for common law trademark infringement and unfair competition under Connecticut law is identical to that under the Lanham Act).

   Provide does not dispute that EA's trademark is valid and protectable; rather, the parties have presented three issues for resolution. Those issues are (i) whether Provide's use of "EDIBLE FRUIT ARRANGEMENTS" in consumer-facing ads creates a likelihood of confusion, (b) whether EA can assert a trademark

infringement claim based solely on Provide's purchase of the EA Mark as a non consumer-facing keyword and whether such purchases create a likelihood of confusion, and (c) whether Provide's advertisements constitute fair use of the mark.  [*See* Def.'s Mem. at 15-16].  The Court considers each issue in turn.

### i.   Whether Provide's Use of "EDIBLE FRUIT ARRANGMENTS" is Likely to Cause Confusion

"[T]he crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question."  *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978).  Federal courts determine whether a mark is likely to cause confusion based on an assessment of the *Polaroid* factors.  These factors include: (i) the strength of the plaintiff's mark; (ii) the degree of similarity between the competing marks; (iii) the proximity of the products, and the likelihood that the prior owner will "bridge the gap"; (iv) actual confusion; (v) the defendant's good faith; (vi) the quality of the defendant's products; and (vii) the sophistication of the consumers.  *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996) (*citing Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).

Summary judgment of non-infringement in a trademark case is proper when the balance of factors weighs in the defendant's favor such that no reasonable jury could find a likelihood of confusion; however, a court need not find that all factors weigh in the defendant's favor.  *See, e.g., Streetwise Maps,*

*Inc. v. VanDam, Inc.*, 21 159 F.3d 739, 746 (2d Cir. 1998) (balance of factors weighed in the defendant's favor even though the mark was entitled to some protection and the parties' products were in direct competition).

### 1. The Strength of EA's Mark

The strength of a mark refers to "its tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source." *The Sports Authority,* 89 F.3d at 961 (*quoting McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). There are two components of a marks' strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Brennan's, Inc. v. Brennan's Rest.*, 360 F.3d 125, 130-31 (2d Cir. 2004) (citations omitted).

An incontestable, registered trademark enjoys a presumption of inherent distinctiveness. *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004). The parties dispute the extent to which EA has been able to register the marks. Provide notes that "when EA first applied to federally register "edible arrangements" as a trademark in 1999, the USPTO refused registration on the basis of descriptiveness" which led EA to amend its application to seek registry on the secondary supplemental federal trademark register "thereby conceding that the phrase 'edible arrangements' is descriptive." [SOMF ¶ 8; Dkt 119-4, Ex. B]. EA, however, has submitted at least one registration of the phrase "edible arrangements" which has been accepted on the principal register, has been in continuous use with no adverse decisions against the mark for more than five

years and which bears no disclaimer.  [*See* Dkt. 134, Ex. C (U.S. Reg. No. 2934715)].  That registration is therefore incontestable. *See* 15 U.S.C. §1065.

The strength of an incontestable registered trademark may be overcome by the use of a descriptive or weak portion of the mark, or generic and descriptive words taken from a stylized logo.  *See W.W.W. Pharmaceutical Co. v. The Gillette Co.*, 984 F.2d 567 (2d Cir.1993) (incontestable registered trademark for "Sportstick" lip balm not infringed by Gillette's "Sport Stick" deodorant); *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1077-78 (2d Cir. 1993) (where stylized logo of the word "parents" for a magazine title was an incontestable mark, use of the word "parents" divorced from that logo was "clearly weak").  Provide, which bears the burden of proof in moving for summary judgment, has not argued or offered evidence that EA's incontestable registration concerns only a stylized logo from which Provide has taken descriptive words and has therefore failed to rebut the presumption in favor of inherent distinctiveness.[3]

Moreover, the Court finds that EA's mark has acquired secondary meaning or distinctiveness in the marketplace.  In evaluating whether a mark has obtained secondary meaning, courts look to a number of factors, including: "(1) advertising expenditures, (2) consumer confusion studies, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark,

---

[3] Indeed, Provide's reply memorandum did not contest EA's assertion that it possesses an incontestable registration and ignores the issue altogether.

and (6) length and exclusivity of the mark's use.*"  Connecticut Cmty. Bank v. The Bank of Greenwich*, 578 F. Supp. 2d 405, 413 (D. Conn. 2008).

EA has submitted evidence that the mark has been in continuous use for seventeen years and that EA has spent "over $160 million in advertising since 2008."  [Dkt. 134, Ex. C. (Dipippa Decl.)].  EA has garnered unsolicited media attention by, for example, "repeatedly being named a Top Franchise by Entrepreneur Magazine . . . [and] being named E! News' gift of choice for Golden Globe nominees."  [Dkt. 134, Ex.'s D-L].  EA has earned billions of dollars in revenues since 2001.  [Dkt 134, Ex. C].  EA has not submitted any consumer confusion studies, but it does cite a survey conducted by Provide which found that EA had 77% brand awareness among consumers nationally.  [Dkt. 134, Ex. M. at PC 000967].  Provide has pointed to numerous attempts to plagiarize the mark by other parties, prompting EA to send "dozens" of cease and desist letters to a range of both large and small businesses.  [SOMF ¶ 12].  Provide has offered no further evidence suggesting non-distinctiveness in the marketplace.   On these facts, a reasonable jury could conclude that EA's mark has acquired secondary distinctiveness in the marketplace.

A reasonable jury could certainly conclude that the strength of EA's mark weighs in favor of finding a likelihood of confusion because the mark has both inherent distinctiveness by virtue of its incontestable registration, as well as secondary distinctiveness in the marketplace.

2.  <u>The degree of similarity between the competing marks</u>

In assessing the similarity of the marks at issue, courts look to two key questions: (1) whether the similarity between the two marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers. *The Sports Auth.*, 89 F.3d at 962.

Provide notes that "each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar."  [Def.'s Mem. At 24, *citing Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984) (affirming summary judgment finding that "Donkey Kong" does not create a likelihood of confusion with "King Kong")].  Provide argues that its use of the phrase "edible fruit arrangements" is distinguishable from EA's mark "because it was not used in a trademark sense, and because it contains the additional term "fruit," which EA's mark does not contain."  [Def.'s Mem. At 24].

With regard to the addition of the word "fruit" to the mark, EA argues, persuasively, that "a subsequent user may not avoid likely confusion about the origin or the product by appropriating another's entire mark and adding descriptive or non-descriptive matter to it."  [Pl.'s Mem. At 19, *citing Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 477 (3d Cir. 1994) (citation omitted)].  To state the obvious, fruit offered for sale is supposed to be edible. The word "edible" is a superfluous modifier of the word "fruit" in an advertisement for a fresh fruit product offered for sale by a company named "Sheri's Berries."  A typical consumer would likely realize that "Sheri's Berries"

17

was offering for sale fruit which was edible, as opposed to inedible, plastic or imitation fruit decorations.  A reasonable jury could find that the addition of the word fruit does not serve a clear "differentiating role."  *Morningside Group*, 182 F.3d at 141 (addition of the words "capital" and the substitution of "LLC" for "limited" did little to differentiate "The Morningside Group Limited" from "Morningside Capital Group, L.L.C."); *see also, Connecticut Community Bank*, 578 F. Supp. 2d at 418 (addition of the word "Trust" did little to differentiate "Greenwich Bank & Trust" from "The Bank of Greenwich").

Provide also argues that the marks can be differentiated because it used the phrase "edible fruit arrangements" in conjunction with reference to its "house" brands (e.g., 'Shari's Berries').  Those terms, however, were not always used in conjunction with one another.  In at least one of the advertisements provided to the Court by EA, Provide's "house brand" only appears in the web address of a link contained in the advertisement.  Further, it appeared beneath the much larger and more readable text advertising, with each word capitalized, "Edible Fruit Arrangements."  *See* Figure II above.  The "house brand" is not prominently displayed and when it is displayed it is virtually obscured by the far more prominent term "Edible Fruit Arrangements."

A reasonable trier of fact could therefore find that Provide has not distinguished its use of the mark with its own branding.  The operative and identifying words of both marks are the words "edible" and "arrangements" and as such the marks are highly similar.  This factor weighs heavily in favor of EA.

### 3.  Similarity of Competing Products

The third *Polaroid* factor focuses on whether the two products compete with each other.  "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion."  *Savin Corp.*, 391 F.3d at 458. Provide does not dispute that its fruit products are similar to EA's fruit products. However, Provide argues, without citation to authority, that this factor "should not weigh heavily in the analysis because the products that are similar are exactly the products that are described both by EA's mark and by the descriptive phrase used by Provide."  [Def.'s Mem. At 32].  On the contrary, the fact that Provide is a direct competitor selling goods within the same general class (even the same specific category of gift) and serving the same purpose weighs heavily in favor of finding that Provide's use of EA's mark is likely to cause confusion.  *See Connecticut Community Bank*, 578 F. Supp. 2d at 418 (noting that 'Greenwich Bank & Trust' and 'The Bank of Greenwich' "provide virtually identical banking services . . .  to an identical consumer base . . . [t]his factor weighs heavily in [Plaintiff's] favor.").

### 4.  Actual Confusion

Evidence that confusion has actually occurred is "convincing evidence that confusion is likely to occur."  *Morningside Group*, 182 F.3d at 141.  Provide argues that EA has not "offered any survey evidence showing a likelihood of

confusion." [Def.'s Mem. at 26]. However, "although the absence of surveys is evidence that actual confusion cannot be shown," a reasonable trier of fact "may still conclude that actual confusion exists in the absence of such evidence, so long as there is other evidence of actual confusion." *The Sports Auth.*, 89 F.3d at 964 (internal citations omitted).

EA notes that it has identified seven instances where consumers "contacted EA's customer call center with inquiries and/or complaints about purchases made from Provide under the mistaken impression that the companies were either the same or affiliated." [SOMF ¶¶ 73-74]. Provide argues that these incidents do not evidence actual confusion because, EA did not identify whether the orders about which the calls were made originated with the consumers clicking on one of Provide's keyword advertisements and that the consumers actually made the purchases from a Provide company believing that they were purchasing the products through EA. [Id.].

However, "evidence of actual confusion need not be limited to evidence of mistaken completed transactions" and the inquiry "need not be confined to evidence that [the Defendant] was able to 'pass off' its services as those of [Plaintiff]." *Morningside Group*, 182 F.3d at 141. Rather, evidence of actual confusion "regarding affiliation or sponsorship is also entirely relevant to the ultimate likelihood-of-confusion inquiry." *Id.*; *see also The Sports Auth.*, 89 F.3d at 964 (Plaintiff's evidence of "misdirected phone calls" and evidence that customers believed there was "a connection between the restaurants and the stores" was sufficient to create a genuine issue of fact). Provide also argues that

20

"such a small number of anecdotes is insufficient evidence of actual confusion when weighed against EA's substantial market success."  [Def.'s Mem. at 27, *citing Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, No. 10 CIV. 3314 RWS, 2015 WL 4033019, at *9 (S.D.N.Y. June 29, 2015) ("[A] small handful of anecdotes. . . is insufficient to establish the presence of actual confusion, particularly when weighed against the nearly $100 million in successful donations that [Plaintiff] receives annually.")].

The Court agrees that the seven incidents of misdirected consumer calls and inquiries seem *de minimis* in comparison with the volume of business transacted by both EA and Provide.  The jury may appropriately consider the number of instances of confusion identified by EA in determining the weight of EA's evidence as to actual confusion.  At this stage, EA's evidence is sufficient to create a material issue of fact as to the extent of actual confusion as to the origination and sponsorship of Provide's products caused by Provide's use of the mark.  The Court does not consider this factor to weigh appreciably in favor of EA.

### 5. 'Bridging the Gap'

As the two parties operate in the same market and directly compete, there is no gap to bridge, and therefore this factor weighs firmly in favor of EA.  *See Connecticut Community Bank*, 578 F. Supp. 2d at 418 ("[T]he two banks are

21

already in direct competition . . . there is no gap to bridge, and this factor weighs in favor of [plaintiff].").

### 6.  The Defendant's Lack of Good Faith

In assessing good faith, courts look to "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."  *The Sports Auth.*, 89 F.3d at 964 (citations omitted).

Several facts lead the Court to conclude that a reasonable juror could find that Provide has acted in bad faith in the instant case.  *First*, as discussed above, the word "edible" is an unnecessary descriptor of the word "fruit" and the word "arrangements" is hardly the most precise descriptor of boxes in which Provide has "deliberately placed" chocolate-dipped strawberries.  To once more state the obvious, every marketed product is arranged to look appealing or to avoid damage in transit or both.  A consumer would not expect a box of hand-dipped strawberries in which the strawberries were haphazardly dumped into a box and partially melted into a mess of coated fruit.  Such pragmatic 'arrangements' are not descriptive of the product but merely standard packaging.  From these two facts alone a reasonable jury could infer intent to exploit the goodwill created by EA's existing mark.  *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1134 (2d Cir. 1982) (evidence of bad faith in deliberate use of wording similar to a protected mark where the chosen wording does not appropriately

describe the product at issue).  **Second**, EA's evidence that Provide may have hired third party web advertisers to generate web traffic from "typosquatting" domains based on the EA mark to Provide's own websites may provide a reasonable trier of fact with further indicia of bad faith on the part of Provide. **Third**, a reasonable juror can infer that the keyword bidding, typosquatting redirection of traffic, and advertisements based on the EA mark may have all been components of a deliberate marketing campaign on Provide's part to generate "impressions" and "conversions" from consumers searching for EA products based on the EA mark.  This factor weighs in favor of EA.

### 7.  Product Quality

Provide argues that the products offered for sale by the two parties are of similar quality.  EA argues that its products are of higher quality because, with respect the parties' "dipped" or fruit products, Provide sells fruit dipped in "imitation chocolate," while EA uses "real chocolate."  [Pl.'s Mem. at 32].  This difference in quality, if true, raises sufficient evidence to at least create a material issue of fact as to differences in product quality.  However, this factor does not weigh appreciably in EA's favor.

### 8.  Consumer Sophistication

The seventh *Polaroid* factor requires a court to analyze the sophistication of the consumers purchasing the competing products.  *Polaroid*, 287 F.2d at 495

(2d Cir. 1961).  Highly sophisticated consumers are less likely to be confused. *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1007 (2d Cir. 1983).

Provide argues, without citation to facts in the record, that "both EA's and Provide's consumers are individuals seeking to purchase high-quality gifts for special occasions."  [Def.'s Mem. at 31].  Provide also argues that there is "no evidence in the record to suggest that the parties' consumers are not sufficiently sophisticated."  [Id.]

EA has pointed to evidence that "the parties' respective coated fruit goods are food items that generally are sold for between $20 and $40."  [Pl.'s Mem. at 24; Dkt. 119, Ex. 2].  Where the products at issue are "relatively inexpensive items," a trier of fact "may be justified in concluding that the parties' customers are not likely to be sophisticated purchasers as to the goods in question."  *The Sports Auth.*, 89 F.3d at 965; *Lever Bros. Co. v. Am. Bakeries Co.*, 693 F.2d 251, 259 (2d Cir.1982).

A reasonable juror could conclude that a buyer of an "arranged" fruit gift package is no more sophisticated than a buyer of flowers, greeting cards or chocolates.  *See, e.g.*, *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 219 (2d Cir. 2003) (New York consumers of specialty pastas deemed unsophisticated because the pastas were inexpensive and sold in grocery stores, despite arguments that New Yorkers were "savvy and knowledgeable about restaurants and food.").  While Second Circuit case law has associated the purchase of low-cost goods in a supermarket environment with low customer sophistication, "price alone is not determinative of the care a consumer will take in making

purchases, and our touchstone remains the general impression that is left with the ordinary consumer." *The Sports Auth., supra at* 965.

Edible Arrangements and Provide's products are not expensive luxury products, but they are also not every day consumables one purchases in a supermarket.  They are moderately priced gift items which would be purchased with some, but not a great deal of scrutiny.  The marketplace in which the products are sold also weighs against sophistication.  Internet purchasing is both fast-paced and rapidly evolving.  Increasingly, purchases are often made impulsively on small screen cellular telephones or even using cell phone applications.  Given the relatively low price of the items and the evolving online marketplace, the court finds that this factor weighs in favor of EA.

### 9.  Overall Assessment

The Court has found that five of the seven *Polaroid* factors weigh in favor of EA and that EA has at least raised a material issue of fact as to the remaining two.  In particular, the strength of EA's mark, the similarity of the competing marks, the similarity of the competing products and the defendant's bad faith each strongly suggest a likelihood of confusion from Provide's use of its mark. Provide's Motion for Summary Judgment as to EA's trademark infringement claims (Counts I, II, IV and V) is therefore DENIED.

### ii.  Keyword Purchases Under the Lanham Act

Provide next argues that its bidding on the phrase "edible arrangments" as a "non-consumer-facing keyword" for its search engine advertisements does not create a likelihood of confusion under the Lanham Act.  The Second Circuit has held that keyword bidding may constitute a "use in commerce" which would be "subject to the same analysis under Lanham Act as any other allegation of infringement."  *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2nd Cir. 2009).  Provide nonetheless argues that "no one court in the entire country has ever held a defendant liable for trademark infringement by finding a likelihood of confusion based solely on the defendant's keyword bidding."  [Def.'s Mem. at 31].  Provide's argument, however, misses the point – the conduct at issue is not a defendant's keyword bidding, considered in a vacuum, but rather the effect of the keyword bidding in conjunction with the defendant's advertisement.

In *Rescuecom*, the Second Circuit reversed a district court's dismissal of a complaint against Google's sale of a plaintiff's mark in its AdWords program.  562 F.3d at 130.  The court held that the sale of the mark as a keyword could constitute a "use in commerce" under the Lanham Act *and also* could create a likelihood of confusion if searchers were "misleadingly directed to the ads and websites of its competitors in a manner which leads them to believe mistakenly that these ads or websites are sponsored by, or affiliated with the plaintiff."  *Id.* Similarly, the Ninth Circuit has held that "[t]he potential infringement in this context arises from the risk that while using [Plaintiff's] mark to search for information about [Plaintiff's] product, a consumer might be confused by a results page that shows a competitor's advertisement on the same screen, when

26

that advertisement does not clearly identify the source or its product.  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011).  Thus, the crux of the issue is whether a defendant's keyword purchases, *combined with the look and placement of that defendant's advertisement*, create a search results page which misleads, confuses or misdirects a consumer searching for a trademarked brand to the website of a competitor in a manner in which the source of the products offered for sale by the competitor is unclear.[4]

The Second Circuit, however, has not adopted an explicit test for determining whether a likelihood of confusion exists from a defendant's purchase of a trademark as a keyword term.  Both parties urge application of the *Polaroid* factors and note that at least two courts in this circuit have examined instances in which a competitor uses a trademark to purchase keywords by looking to the same seven *Polaroid* factors.  *See Alzheimer's Foundation*, 2015 WL 4033019 at *8; *CJ Products LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 158 (E.D.N.Y. 2011).  Several of the Polaroid factors, however, are not particularly helpful in this context, and the court in the *Alzheimer's* case primarily considered the actual confusion factor.  With regard to actual confusion, the *Alzheimer's* court looked

---

[4] In *Rescuecom*, the Second Circuit found that the plaintiff had a plausible claim under the Lanham Act *against the search provider* (as opposed to the advertiser) in part because the plaintiff alleged that "the advertiser's link appears in a horizontal band at the top of the list of search results in a manner which makes it appear to be the most relevant search result and not an advertisement."  562 F.3d at 130-131.  Furthermore, the plaintiff alleged that Google failed to "adequately identify the sponsored link as an advertisement, rather than a relevant search result."  *Id.*  Thus a likelihood of confusion may have been created because a consumer searching for results by using the plaintiff's mark would have been misled into believing that the defendant's website was "most relevant" to the plaintiff's mark and therefore that the defendant's website was affiliated with the plaintiff.  *Id.*

to the doctrine of "initial interest confusion," in which "a likelihood of confusion can arise when 'a consumer who searches for the plaintiff's website with the aid of a search engine is directed instead to the defendant's site because of a similarity in the parties' website address." 2015 WL 4033019, at *7 (quoting *CJ Products*, 809 F.Supp.2d at 160). The *Alzheimer*'s court also considered the similarity of the marks factor by looking to the similarity of the URLs and the text in the links of the two competitors on the search results page. *Id.*, *see also CJ Products,* 809 F.Supp.2d at 160 (examining the similarity of the marks in the AdWords context and considering "the degree of similarity between [p]laintiff[s]' service mark and the . . . advertisements appearing on the search-results page").

However, the *Alzheimer*'s court also noted that "[c]ompanies can and do regularly purchase other companies' marks as search keywords and use those companies' trademarks in the text of their search advertising in order to draw a contrast with the searched-for product and offer their own as an alternative." 2015 WL 4033019, at *6. As an example, the *Alzheimers* court noted that "a Yahoo! search for the term "Honda Civic" brings up ads linking to websites from Hyundai, Volkswagen, and Toyota, comparing the Civic to their cars and suggesting that the consumer purchase an Elantra, Jetta, or Corolla instead." *Id.* The court held that those ads did not implicate the Lanham Act "because they draw a clear distinction between the products and do not imply the trademark holder's sponsorship or approval." *Id.*

Thus, prior courts have been primarily concerned with keyword bidding in conjunction with advertising that creates a search results page that is misleading

to the consumer.  In considering the question of whether such conduct violates the Lanham Act, several *Polaroid* factors can be helpful when viewed from the perspective of a user of the internet search engine at issue (the "user"), in particular: (i) the strength of the plaintiff's mark as a unique search term related to a distinct line of products, and (ii) the similarity of the marks and whether the defendant's mark draws a clear distinction as a competing brand.  One additional factor described by the Ninth Circuit in *Network Automation* can also be helpful: (iii) what the consumer saw on the screen and reasonably believed, given the context.  638 F.3d at 1150.

   With regard to the strength of the mark, the court considers whether a user entering EA's mark as a search term "is more likely to be looking for a particular product" rather than a category of products, and therefore "could be more susceptible to confusion when sponsored links appear that advertise a similar product from a different source."  *Network Automation*, 638 F.3d at 1149.  The Court earlier found that there was evidence that EA's mark had acquired secondary distinctiveness in the marketplace.  Similarly, the Court here finds that a reasonable trier of fact could conclude that a consumer searching for "edible arrangements" is looking for a distinct product line of aesthetically shaped fruit and not merely for any and all gifts containing boxes of edible fruits and berries.  And with regard to the similarity of the marks, the Court finds that the Provide advertisements it has examined make a very poor effort to differentiate either a competing product or seller.

The Ninth Circuit also looked to "what the consumer saw on the screen and reasonably believed, given the context." *Id.* at 1150, *quoting Hearts on Fire Co. v. Blue Nile, Inc.*, 603 F.Supp.2d 274, 289 (D. Mass. 2009).  As to this factor, one district court in the District of Massachusetts considered possible "downstream" confusion, and whether the user would be unknowingly misdirected to the website of a competitor.  See *Hearts on Fire Co.*, 603 F.Supp.2d at 289 (noting the importance of whether "the consumer clicked on the sponsored link thinking that he would find products" affiliated with the mark, but upon landing at the competitor's website "nothing there would immediately alert him to his mistake").  Here, Provide's choice not to identify Pro Flowers or Sherri's Berries as the advertiser in the text of the advertisement or the link, and only in the small print of the URL, contributes to a misleading environment for the consumer.  In particular, a user searching for EA's products might not even know that they had clicked on a link for a competitor's product until they actually landed on the webpage of one of Provide's sellers, or even after that point

A reasonable trier of fact could conclude that Provide's purchase of "edible arrangements" as a non-consumer facing keyword could result in a likelihood of confusion by directing consumers to a search results page in which it advertised "edible fruit arrangements" in an text advertisement in which the seller is only identified in the small print of the URL.  *See* Figure II.  A jury could find that the purpose and effect of Provide's keyword bidding – in conjunction with its use of EA's mark in its advertisement on the search results page – was to mislead

consumers as to sponsorship or affiliation with EA and to misdirect the web traffic of users searching for EA's mark.

### iii.  Provide's Defense of Fair Use

A company's use of such descriptive words and phrases to describe that company's products may constitute "descriptive fair use" and be permissible even where a plaintiff owns a federal registration for a trademark that is similar to the phrase that the defendant uses to describe its goods.  15 U.S.C.A. § 1115(b)(4).  Courts use a three-part test to determine whether use of a mark is a descriptive fair use, namely, if the use was made: (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith.  *Kelly-Brown v. Winfrey*, 717 F. 3d 295, 308 (2nd Cir. 2013).  Provide argues that it did not use the phrase "edible fruit arrangements" as a trademark, and EA did not contest this.[5]  Rather, the parties dispute whether Provide's use of the phrase was descriptive and in good faith.

Provide argues that its use of "edible fruit arrangements" was descriptive because the phrase describes the composition of several of its products, which "are fruit products ("fruit")" that "are organized in a certain manner ("arranged")" and are "intended for consumption ("edible")."  [Def.'s Mem. at 18].  Provide has

---

[5] "A trademark use occurs when a mark indicates the source or origin of consumer products."  *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 424 (S.D.N.Y. 2008) *aff'd*, 329 F. App'x 333 (2d Cir. 2009).  The Second Circuit has equated "use as a mark with the use of a term as a symbol to attract public attention."  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 400 (2d Cir. 2009) (internal quotations omitted).

not identified which of its products, specifically, qualify in its view as edible arrangements of fruit.  EA argues that Provide does not sell "arrangements" at all and submitted as an exhibit in opposition to Provide's Motion for Summary Judgment a photograph of one of Provide's fruit products in which chocolate-dipped berries were, in Provide's own words, "organized so that the berries are evenly spaced and angled toward a particular corner of the box."  [Def.'s Rep. Mem. at 3; Dkt. 136, Ex. TT].  Provide describes this as an "arrangement."  [Id.].

Miriam Webster defines an "arrangement" as "the way that things or people are organized for a particular purpose or activity."[6]  The dictionary definition of the word does not include any component requiring *artistic* placement or organization.  Thus, Provide is correct that for its products to constitute an "arrangement," the definition of the word requires only a purposeful or intentional presentation, which would seemingly include a box of strawberries that are evenly spaced and facing the same direction.

A consumer and a reasonable juror, however, may understand the word "arrangement" to connote both purposefulness as well as something more, such as a collection of items that is organized in an artistic or creative manner – presented so as to enhance aesthetic value through color, shape or format.  Thus, Provide's use of the word "arrangement" may be literally accurate but descriptively misleading.  Similarly, while the word "edible" is an accurate description of the fruit Provide sells, a reasonable juror may find that the word is,

---

[6]  http://www.merriam-webster.com/dictionary/arrangement

as the Court discussed above, largely redundant of the word "fruit," given that few consumers are likely searching for "inedible fruit."  *See EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 65 (2d Cir. 2000) (material issue of fact as to descriptive use where the alliterative phrase "Swing Swing Swing" was unnecessary to describe the actions of three actors hitting golf shots when the single word "swing" would have sufficed).  The defense of fair use is designed to protect "the public's right to use descriptive words or images in good faith in their ordinary descriptive sense."  *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995).  EA has raised a material issue of fact as to whether Provide's use of the phrase "edible fruit arrangements" relies upon the ordinary meanings of those words to describe a product containing a box of "deliberately placed" strawberries.

But even if Provide's use of the phrase was appropriately descriptive, a reasonable juror could find that Provide chose to use the words "edible" and "arrangements" in bad faith in order to maximize consumer confusion and generate sales from misdirected web traffic, when other terms not involving EA's mark could have better described Provide's products (such as, e.g., "chocolate-dipped berries" instead of "edible fruit" and "gift boxes" instead of "arrangements").  In addition, for the reasons discussed above in examining the *Polaroid* factors, a reasonable juror could certainly find that in the instant case Provide deliberately chose the phrase "edible fruit arrangements" as part of a marketing campaign designed to capitalize on the popularity of EA's products by misdirecting consumer traffic to Provide's websites through the use of EA's mark

in advertising, keyword bidding and typosquatting.  EA has therefore raised a material issue of fact as to whether Provide's use of the phrase "edible fruit arrangements" was truly descriptive and in good faith.


### b.  EA's Claim for Trademark Dilution

The Trademark Dilution Revision Act ("TDRA") "allows the owner of a 'famous mark' to enjoin a person from using 'a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark.'"  *Tiffany (NJ) Inc. v. eBay Inc* ., 600 F.3d 93, 110–11 (2d Cir. 2010) (quoting 15 U.S.C. § 1125(c)(1)).  Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services."  15 U.S.C. § 1125.  To plead dilution under the TDRA, a trademark owner must allege four elements: (i) that the mark is famous; (ii) that the defendant is making use of the mark in commerce; (iii) that such use began after the mark became famous; and (iv) that there is a likelihood of dilution as a result of the defendant's use.  *Id.; Tiffany (NJ) Inc.*, 600 F.3d at 111.  The parties in the instant matter contest the extent to which EA's mark is famous and would be diluted as a result of Provide's use.

### i.  The Fame of EA's Mark

"[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  Courts may consider the following factors: (i) the extent and geographic reach of the advertising and publicity of the

mark, (ii) the volume and geographic extent of the sales of goods offered under the mark, (iii) the extent of actual consumer recognition of the mark, and (iv) whether the mark was registered on the principal register. *Id.* On summary judgment, whether a mark has attained the requisite level of fame is a question of fact that must be left to the trier of fact if the plaintiff shows "more than a mere scintilla of evidence" of fame. *See Savin Corp.*, 391 F.3d at 450.

EA notes that it generated nearly a billion dollars in sales between 2001 and 2009. [Dkt. 136, Ex. C at 4]. In the years 2008 and 2009, EA spent $28 million in advertising. [Id.]. EA's mark is registered on the principal register. And, as noted earlier, Provide's own consumer survey found that EA had 77% brand awareness among consumers nationally. [Dkt. 134, Ex. M. at PC 000967]. At this stage, EA has pointed to sufficient evidence suggesting that its mark is famous as to raise a material issue of fact. *See, e.g.*, *Savin Corp.*, 391 F.3d at 450 (Plaintiff's $20 million advertising spend, $675 million in revenues, and extensive advertising in mainstream and industry media were "sufficient indicators of fame to withstand a summary judgment challenge.").

### ii.  Dilution by Blurring

Dilution by blurring is "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. §1125(c)(2)(B). "Dilution by blurring refers . . . to 'the whittling away of [the] established trademark's selling power and value through its unauthorized use by others.'" *Tiffany (NJ) Inc.*, 600 F.3d at 111. There are six non-exhaustive factors which courts consider in determining whether there has

been dilution by blurring, including: (i) the degree of similarity between the marks, (ii) the degree of inherent or acquired distinctiveness of the famous mark, (iii) whether use of the famous mark is exclusive, (iv) the degree of recognition of the famous mark, (v) whether the user of the mark intended to create an association with the famous mark, and (vi) any actual association between the mark and the famous mark.  15 U.S.C. §1125(c)(2)(B)(-vi).

The first two factors – similarity and distinctiveness – overlap with the first two *Polaroid* factors examined above, and, for the reasons stated above, the court finds that these facts weigh in favor of EA at this stage.  The fourth factor – degree of recognition – also weighs in EA's favor for the same reasons discussed above in the Court's determination that EA has pointed to sufficient evidence of fame in the form of wide public recognition of EA's mark.  With regard to the fifth factor, EA has also pointed to evidence that Provide intended to create an association with EA's mark by engaging in a deliberate marketing strategy to misdirect consumers from EA's website through the use of EA's mark in advertising, keyword bidding and typosquatting.  EA has raised a material issue of fact with regard to whether Provide's conduct constituted dilution by blurring.

### iii.  Dilution by Tarnishment

Dilution by tarnishment is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. § 1125(c)(2)(C).  "A trademark may be tarnished

when it is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Deere & Co. v. MTD Prods.*, 41 F.3d 39, 43 (2d Cir. 1994).

EA's sole evidence in support of its dilution by tarnishment claim is the fact that Provide coats its "dipped fruit" products in "imitation chocolate," instead of "real chocolate." [Pl.'s Mem. at 32]. In this regard, EA has identified a difference in quality between the two competing products. However, the statute prohibits dilution resulting in "reputational harm" and "[t]he *sina qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996). The critical missing link in EA's dilution by tarnishment claim is that the imitation chocolate used in Provide's products will taste, look or smell poorly to the consumer, resulting in a negative association with EA's mark. EA assumes this fact to be true, and its claim would require a trier of fact to assume the truth that fact as well. At this stage, however, EA's "mere scintilla" of evidence of dilution by tarnishment is sufficient to create a material issue of fact.

### c. EA's Claim for Cybersquatting

The Anticybersquatting Consumer Protection Act ("ACPA") was passed in part to prohibit "the bad-faith and abusive registration of distinctive marks as

Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as 'cybersquatting'." *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 495 (2d Cir. 2000). 'Typosquatting' – in which the defendant registers intentional misspellings of a distinctive marks – has been found to be an actionable form of cybersquatting. *See Shields v. Zuccarini*, 254 F.3d 476, 483 (3d Cir. 2001); *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 430 (S.D.N.Y. 2013) ("courts have expressly held that the ACPA covers typosquatting").

To prevail on its ACPA claim, EA must show that Provide: (1) had a bad faith intent to profit; and (2) registers, traffics in or uses a domain name that is identical or confusingly similar to EA's famous and/or distinctive mark. *See Sporty's Farm*, 202 F.3d at 496-498; 15 U.S.C. §1125(d)(1)(A).

Provide argues that EA has failed to identify any evidence that it registered, trafficked in or used the domain names at issue. EA admits that "the true registrant of the Typosquatting Domains has not been conclusively determined," but nonetheless argues that Provide "and/or its agents trafficked in and/or used" the domains to divert EA's customers. [Pl.'s Mem. at 35]. In a prior ruling denying Provide's motion for judgment on the pleadings, this Court held that "if through discovery it becomes apparent that the true owner of the typosquatting domains registered the domain names on behalf of Provide Commerce, this domain name registrant would be considered an agent" of the defendant and would not have been a necessary party to the action in order to afford complete relief under Fed. R. Civ. P. 19(a). *Edible Arrangements, LLC v. Provide*

*Commerce, Inc.*, No. 3:14-CV-00250 VLB, 2015 WL 1321441, at *4 (D. Conn. Mar. 24, 2015).  Having conducted discovery into the matter, EA's sole evidence in support of its allegation that Provide's agents trafficked and/or used the domains at issue consists of the following facts:

1. Provide hired two digital marketing companies in late 2013 to increase its web traffic – adMarketplace, Inc. and 7Search, Inc. [Dkt. 136, Ex.'s DD, KK].
2. Shortly thereafter in January 2014, adMarketplace and 7Search records show that redirects from the typosquatting domains to Provide's websites began and continued until June 2014. [Dkt. 136, Ex.'s EE, II, NN].
3. Consumers attempting to reach ediblearrangements.com were redirected to Provide's competing website thousands of times.  [Dkt. 136, Ex.'s EE, II, NN].
4. Provide admits that both adMarketplace and 7Search were somehow involved in the redirects because both companies' names appeared in the URL reference code of the redirects.  [Dkt. 136, Ex DD Twu Dep. at 207:4-14].
5. The redirects stopped after EA filed a motion for a preliminary injunction and Provide sent a letter instructing adMarketplace to "[s]top sending [Provide] traffic from these domains."  [Def.'s Mem. at 13].

It is clear from the facts above that Provide benefited from the Typosquatting Domains in the form of additional web traffic and that Provide's web marketing agents played a role in redirecting web traffic from the Typosquatting Domains to Provide's own website.  However, the precise role that Provide's marketing agents played in the process of registering the domains at issue is still unclear.  EA failed to offer evidence indicating that the redirection of web traffic from theTtyposquatting Domains could not have occurred unless adMarketplace and 7search were the "users" of those websites within the meaning of the ACPA, through, for example, hosting or maintaining the typosquatting domains or implementing the coding which resulted in the traffic

redirection.  EA had the opportunity to collect records from both adMarketplace and 7search, to discover Provide's contracts and communications with both companies, to depose Provide's web marketing team and the opportunity to develop expert testimony on the issue to assist a trier of fact in drawing further inferences from the evidence described above.  EA failed to do so.

Moreover, even if there was clear evidence linking adMarketplace and 7search with the "use" of the domain names within the meaning of ACPA, the statute makes clear that a defendant can only be liable for "use" of a cybersquatting domain "if that person is the domain name registrant or that registrant's authorized licensee."  15 U.S.C. § 1125(d)(1)(E).  Thus, even if EA's evidence were sufficient to raise a material issue of fact with respect to whether an agent of Provide "used" the Typosquatting Domains to redirect web traffic to Provide, EA failed to offer evidencethat either Provide or its agent(s) are the actual registrants of the domains or licensees of the actual registrants.  Under the plain language of the statute, EA has therefore raised insufficient evidence to sustain an ACPA claim.  Count VI of the Complaint is DISMISSED.

###   V.   Conclusion

For the reasons stated above, the defendant's Motion for Summary Judgment [Dkt. 116] is GRANTED IN PART with respect to EA's ACPA claim (Count VI) AND DENIED IN PART with respect to all other claims.  Count VI is DISMISSED.  This case will proceed to trial with respect to all other claims.

**IT IS SO ORDERED.**


_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: July 29, 2016**